The DREXEL BURNHAM LAMBERT GROUP, INC., Plaintiff,

v.

A.W. GALADARI and A.W. Galadari Commodities, Defendants.

REFCO, INC., Plaintiff,

v.

Abdul Wahab Bin Ebrahim GALADARI and A.W. Galadari Commodities, Defendants,

The Committee of Receivers for Abdul Wahab Bin Ebrahim Galadari and A.W. Galadari Commodities, Additional Defendant.

Nos. 84 Civ. 2602 (CBM), 90 Civ. 2140 (CBM).

United States District Court, S.D. New York.

April 8, 1991.

Bickel & Brewer by Carlton Asher, Jr., New York City, for Committee of Receivers.

Richards & O'Neil by Edward Powers and Natalie Gomez, New York City, Thomas Hill, West Palm Beach, Fla., for Drexel Lambert.

Graubard Millen Horowitz Pomeranz & Shapiro by Therese M. Doherty and Marianne Bretton–Granatoor, New York City, for Refco.

## SUPPLEMENTAL OPINION RE: VACATING STAY

MOTLEY, District Judge.

### SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### PRELIMINARY STATEMENT

This is a motion by plaintiff Refco, Inc. ("Refco") to vacate the stay of this action imposed by this Court's Order dated January 4, 1991, in favor of a foreign liquidation proceeding in Dubai, United Arab Emirates. Refco argues that the receivership proceedings in Dubai are fundamentally unfair and have deprived Refco of due process, and that, therefore, the Dubai proceedings are not entitled to international comity.

On March 18 and 19, 1991, this Court conducted a hearing on Refco's motion to lift the stay. Refco presented the testimony of Phillip Bennett ("Bennett"), Chief Financial Officer of Refco [R.Tr. 3–4] [1], and Jack Weinberg ("Weinberg"), partner in charge of the Galadari matters at the Graubard Mollen Horowitz Pomeranz & Shapiro firm (the "Graubard firm") [R.Tr. 123]. Bennett testified with respect to his dealings with the Committee of Receivers (the "Committee") and with Carlton R. Asher, Jr., Esq. ("Asher"), who has been representing the Committee in Refco's action against Galadari and the Committee. Weinberg testified to his dealings with Asher.

The Committee failed to present any witnesses to rebut Refco's showing that the Dubai proceedings have been fundamentally unfair and have denied Refco due process.[2] Specifically, the Committee failed to present the testimony of any of its members to explain the reasons, if any, for the Committee's unconscionable delay in adjudicating Refco's claim.

Refco has demonstrated that is has been denied due process in the Dubai proceedings because the Committee, under the control of Asher, (a) inordinately delayed its decision on Refco's claim, (b) misrepresented to Refco the status of the Committee's determination of Refco's claim, (c) dictated the results of what purported to be a key unbiased report by an expert to the Committee, (d) barred Refco from fully participating in the proceedings before the Committee, (e) abdicated to Asher and Richards Butler the Committee's function as fact finder and judge, (f) acted both as trustee and judge, and (g) concocted new issues in 1990, and at the hearing before this Court on March 19, 1990, as further obstacles to Refco's claim, and falsely labelled those issues as matters that had been and remain "open."

The testimony offered by Refco was substantially unrebutted. There was no witness who testified for the Committee regarding its conduct in the purported adjudication of Refco's claim.

### Proposed Findings of Fact

A. The Parties

Refco is an Illinois corporation with its principal place of business in Chicago, Illi-

---

**1.** References to the hearing transcript on Refco's motion will be referred to herein as "R. Tr. ___." References to the January 16–18, 1991 hearing transcript on Drexel's motion will be referred to herein as "D. Tr. ___."

**2.** Asher was the only witness for the Committee. His direct testimony [R.Tr. 237–39] was limited to two assertions: First, Asher swore that he "will not be involved and will not participate in the [Committee's] decision-making process" [R.Tr. 238–39] As the findings below show, this assertion by Asher has little, if any, probative weight. Second, Asher swore that he and Weinberg did not have one of the conversations that Weinberg testified to [R.Tr. 238–39]. But, on cross-examination, Asher acknowledged that he and Weinberg may have had the discussion about which Weinberg testified, but on a later date [*Id.* at 239–40].

nois. Refco is registered as a Futures Commission Merchant pursuant to the Commodity Exchange Act, 7 U.S.C. § 1 *et seq*. [Complaint, ¶ 1].

The Committee was appointed on or about April 17, 1984, pursuant to an *ad hoc* decree issued by the government of Dubai, to manage the affairs of defendant Abdul Wahab Bin Ebrahim Galadari ("Galadari") and certain Galadari companies, including defendant A.W. Galadari Commodities ("Commodities") [Drexel Ex. S].

The Committee at all times has been, and it still is, represented in this action by Asher, formerly a member of the law firm of Gaston & Snow and presently a member of the law firm of Bickel & Brewer [R.Tr. 125, 237].

The Committee at all times has been, and it still is, represented in the Dubai proceedings by Asher [R.Tr. 125] and, since mid–1989, by the London, England law firm of Richards Butler [Drexel Ex. A–2 (192), (196)].

B. The Galadari Debt Owed to Refco Which Forms the Basis for the Instant Action

On or about February 7, 1983, defendants Galadari and Commodities opened five trading accounts with Refco (the "Accounts") and commenced trading in the Accounts. [Complaint, ¶ 4; Ex. R32].

In or about May 1983, the debit balance in the Accounts was $6,109,664.20. On or about July 6, 1983, Galadari executed a letter agreement (the "1983 Agreement"), on behalf of himself and Commodities, acknowledging the debt owed to Refco. [Ex. R27(A); R.Tr. 6–7].

Pursuant to the 1983 Agreement, Galadari paid Refco $500,000 on each of three occasions during the period of September to November 1983 [Ex. R27; R.Tr. 5–6]. Thereafter, Galadari made no further payments [*Id.*]. The remaining debt for which Galadari and Commodities are liable to Refco is $4,609,664.20 [Complaint, ¶ 7; Ex. R27(A)].

C. Refco's New York Action Against Galadari and the Committee's Intervention in That Action

On August 10, 1984, Refco commenced an action against Galadari and Commodities in the State Supreme Court, New York County (the "United States Action") predicated upon Galadari's failure to satisfy the 1983 Agreement. Refco obtained an order to show cause containing a temporary restraining order (the "Restraining Order;" Removal Ex. B).[3] The Restraining Order provided that:

> defendants and any person in possession of property in which defendants have an interest or owing debts to the defendants and as prospective garnishees herein, and their employees, agents, assigns and all persons acting in concert with them, are restrained from making or suffering any sale, assignment or transfer of, or any interference with, or paying over or otherwise disposing of, or taking any steps to sell, assign, transfer, interfere with, pay over or otherwise dispose of from any proceeds or property or debt of the defendants to the extent of $4,609,-664.20

[*Id.* at 3].

The Restraining Order directed defendants Galadari and Commodities to show cause why an order should not be entered, *inter alia*, granting Refco an order of attachment and directing the sheriff to levy upon the property in which either defendant had an interest and upon debts owing to either defendant for the purposes of satisfying any judgment that may be obtained by Refco in the amount of $4,609,-664.20 [*Id.* at 2].

By stipulation dated October 9, 1984, the Committee, which had not been a party to the action, appeared in the action by New York counsel (Asher) and agreed to extend the Restraining Order. Thereafter, the Committee actively opposed Refco's motion for an order of attachment.

---

**3.** References to the exhibits annexed to the Committee's notice to remove the United States Action from the New York state court to this Court are designated "Removal Ex. ___."

By memorandum decision dated March 27, 1985, and entered on April 3, 1985 [Removal Ex. D], the state court, *inter alia,* (a) continued the Restraining Order as it related to a New York condominium which Galadari maintained at 641 Fifth Avenue, New York, New York (the "Apartment"), but denied Refco's motion for an order of attachment, and (b) added the Committee as an additional defendant. The Committee never sought to modify or dissolve the Restraining Order. The Restraining Order remains in full force and effect [R.Tr. 124]. *See* 28 U.S.C. § 1450.

By stipulations between the attorneys for the Committee (Asher) and Refco, the Committee's time to answer or otherwise move with respect to the summons and complaint in United States Action was, at the Committee's request, continously adjourned [R.Tr. 128–30].

Refco consented to the Committee's requests for adjournments in the United States Action based on representations by Asher that the Committee was actively reviewing Refco's claim in the Dubai proceedings [R.Tr. 39–40, 135, 212].

### D. Refco Fully Submitted Its Claim to the Committee in 1987

By letter dated May 24, 1984, the Committee informed Refco that it had "been appointed to manage the affairs of the Galadari companies and the Galadari assets" and was "empowered to proceed with the orderly realization of funds and then to distribute the proceeds of realizations ..." [Ex. R1; R.Tr. 8–9]. The letter informed Refco also "that creditors are forthwith required to send in their names and addresses and particulars of their debt or claim" to the Committee before July 31, 1984 [*Id.*].

On July 16, 1984, Refco timely submitted to the Committee its formal proof of claim [Ex. R27; R.Tr. 5, 10].

By telex dated August 18, 1984, the Committee acknowledged receipt of Refco's formal claim and represented that Refco's claim was under review [Ex. R28].

The Committee did not consider Refco's claim until February 1987, some two and one-half years after the claim was submitted. By telex dated February 4, 1987, the Committee notified Refco that a meeting would be held two weeks later, on February 21, 1987, in Dubai, to consider Refco's claim [Ex. R3; R.Tr. 12].

In light of the very short notice the Committee gave Refco, Refco requested a short adjournment of the meeting to enable it fully and properly to prepare the necessary documentation and to arrange for legal representation at the meeting [Ex. R4; R.Tr. 13, 126]. However, the Committee refused to grant even a short adjournment [Ex. R30; R.Tr. 14]. As a result, Refco was unable to prepare a full presentation of its claim and was not represented by counsel at the meeting in Dubai [R.Tr. 14, 18, 57].

Notwithstanding the Committee's refusal to adjourn the meeting, and in pursuit of advancing the receivership process and the prompt consideration of its claim, Refco proceeded to provide to the Committee information and documentation in support of Refco's claim.

On February 21 and 22, 1987, Bennett, as Chief Financial Officer of Refco, met with the Committee in Dubai [Ex. R6, R7; R.Tr. 14–15].

Asher represented the Committee at the Dubai meetings with Refco [R.Tr. 15–16]. Asher also propounded questions to Bennett [Ex. R6, R7; R.Tr. 20].

At the meetings, Bennett fully responded to the questions propounded by Asher and by the Chairman of the Committee, Abdulla Hassan Al–Rostamani [Ex. R6; R.Tr. 20]. Bennett described (a) the background of the relationship between Refco and Galadari, (b) how Galadari was introduced to Refco, (c) the initial negotiations which resulted in the opening of the Galadari Accounts with Refco, (d) the structure of the Galadari Accounts, (e) the liquidation of the Accounts in May 1983, and (f) the meeting with Galadari on July 6, 1983 and Galadari's execution of the 1983 Agreement [Ex. R6, R6; R.Tr. 16–20].

In response to Asher's questions, Bennett also discussed the exchange margin

rules and requirements and whether any trading activity occurred in any of the accounts after the May 1983 liquidation [Ex. R6, R7; R.Tr. 17]. Bennett informed the Committee also that, in 1984, Refco had terminated the employment of Max Van Til, who had been the Galadari account executive at Refco and, therefore, Van Til was not within Refco's control [Ex. R7; R.Tr. 45].

Bennett fully responded to each of the inquiries of the Committee and Asher with respect to Refco's claim [Ex. R6, R7; R.Tr. 127, 141].

Bennett was informed that money had come into the receivership estate as a result of the Committee's settlement with some of Commodities' debtors [Ex. R7; R.Tr. 19]. Bennett was informed also that the Committee had successfully prosecuted a claim against one of Commodities' debtors, but the case was on appeal [Id.]. The Committee stated also that it was pursuing "several millions of dollars" in additional claims. The Committee agreed to provide Refco with an aggregate total of the debt owed to Commodities and copies of the lawsuits which had been filed [Id.].

The Committee never informed Refco that Commodities did not have sufficient assets to pay Refco's claim [Ex. R6, R7; R.Tr. 134-35].

By letter dated April 8, 1987 (the "April 8, 1987 Letter"), Refco provided all of the information in support of its claim that the Committee had requested by its telex of February 4, 1987 and which Bennett had been unable to provide at the meetings in Dubai [Ex. R32]. By the April 8, 1987 Letter, Bennett provided also the additional information that the Committee requested at the February 1987 Dubai meetings. [Id.].

The April 8, 1987 Letter set forth (a) the nature of Refco's claim against Galadari and Commodities, (b) the significance of the 1983 Agreement executed by Galadari, (c) the events giving rise to the debit balance in the Galadari Accounts, (d) the liquidation of the Galadari Accounts, and (e) that Galadari was never permitted to trade in the Galadari Accounts while having a debit bal-

ance and that any trading in the Accounts after liquidation was not on behalf of Galadari [Ex. R32; R.Tr. 45]. Bennett executed and sent to the Committee an affidavit attesting that the facts described in the April 8, 1987 Letter and the accompanying documents were true, to the best of his knowledge, information and belief [Ex. R32].

Along with the April 8, 1987 Letter, Refco forwarded the following documents to the Committee: (a) the 1983 Agreement, (b) the customer agreements, (c) details of daily settlement prices for deposits, and (d) daily purchase and sale statements and monthly summaries of accounts reflecting all the activity in the Galadari Accounts [Ex. R32; R.Tr. 18-19, 21-30].

The Committee never asked Refco to provide additional evidence in support of its claim [R.Tr. 33, 36-38, 56, 95-96, 131]. The Committee never indicated to Refco that its submission was incomplete [Id.], or that any additional documentation was necessary for the Committee to determine and resolve Refco's claim [R.Tr. 37].

As of April 1987, and until February 1990, Refco had every reason to believe that it had provided the Committee with all of the information that the Committee needed in order to adjudicate Refco's claim. During that three year period, the Committee did not ask Refco to provide any additional papers or testimony or other information [R.Tr. 33, 36-38, 56, 95-96, 131].

Refco's belief that it had fully submitted all of the information that the Committee needed was corroborated by Asher to Bennett at a meeting Bennett had with Asher after April 1987 [R.Tr. 37-38].

Based on (a) Bennett's meeting with the Committee and Asher in Dubai, in February 1987, (b) Bennett's meeting with Asher in New York, after April 1987, and (c) Asher's representations to Weinberg in and after April 1988, Refco properly believed that its claim had not been contested and that payment of Refco's claim was awaiting only the Committee's determination of the Holdings/Commodities Issue, so that the Committee could properly pay Refco

either out of the combined assets of Holdings and Commodities or solely out of the assets of Commodities. [R.Tr. 37–38, 134].[4]

During the three years following Refco's full submission to the Committee in April 1987, Refco did not receive any communication from the Committee with respect to the status of its claim. [R.Tr. 202].

Refco, however, did make several unsuccessful attempts to obtain information from the Committee with respect to the status of Refco's claim [Ex. R29, R11, R33]. For example, by telex dated February 11, 1985 addressed to the Committee [Ex. R29; R.Tr. 11], Mr. Bennett requested a report of "the status of the liquidation of those Galadari assets to which we look in settlement of our outstanding claim." Refco's request for information was completely ignored by the Committee [R.Tr. 11–12].

Again, by letter dated November 17, 1987 [Ex. R11] addressed directly to the Committee, Refco requested that the Committee provide a status report on Refco's claim and on the Holdings/Commodities Issue [R.Tr. 33–34]. The Committee again failed to respond to Refco's request [R.Tr. 34].

By letter dated December 24, 1987, Refco renewed its request directly to the Committee [Ex. R33; R.Tr. 35]. But the Committee did not respond to Refco's request for a status report [R.Tr. 35].

By letter dated December 27, 1987 [Ex. R12; R.Tr. 35], Asher transmitted to Refco the proposed findings and decisions which were submitted by Asher and counsel for Drexel to the Committee on the Holdings/Commodities Issue. Asher reported that "the Committee of Receivers has not yet decided Drexel Burnham's purported claim against A.W. Galadari Holdings (Private) Ltd." [Ex. R12]. However, Asher's letter did not answer Refco's inquiry regarding the status of the Committee's review of Refco's proof of claim [Ex. R12; R.Tr. 36].

Significantly, in his December 1987 letter, Asher did not indicate that the Committee needed or requested Refco to provide additional evidence to enable the Committee to determine the validity of Refco's claim [Ex. R12]. Nor did Asher request any evidence from Refco with respect to the Holdings/Commodities Issue [Ex. R12; R.Tr. 36].

E. Refco Reasonably Relied on Asher's Representations That the Committee Was Considering Refco's Claim and That the Committee's Decision Was Imminent

From April 1988 through January 1990, Asher, on behalf of the Committee, spoke regularly with Weinberg, Refco's counsel [R.Tr. 128–30]. Approximately every six to eight weeks, for a period of two years, Asher contacted Weinberg to request an adjournment of the Committee's time to answer or move against the complaint in the United States Action [*Id.*].

In the course of these numerous conversations, Asher purported to report on the status of the Dubai proceedings [R.Tr. 127]. It is undisputed that, on each occasion, Asher informed Weinberg that resolution of Refco's claim was "imminent" and "just around the corner" [R.Tr. 138, 208–09].

During the course of their conversations, Asher never once advised Weinberg that the Committee needed additional information from Refco to determine Refco's claim [R.Tr. 131]. Asher never informed Weinberg that any issue with respect to Refco's claim, other than the Holdings/Commodities Issue, remained "open" or "unresolved" [R.Tr. 131, 212]. Asher also never requested that Refco produce or make arrangements for the production of Max Van Til for deposition [R.Tr. 131].[5]

During these discussions, Asher also advised Weinberg that the Committee was actively reviewing the Holdings/Commodities Issue, that Drexel was actively pursu-

---

**4.** The Holdings/Commodities Issue concerns whether Commodities is a division or subsidiary of Holdings such that Holdings should be liable for the debts of Commodities.

**5.** In fact, the Committee's own Special Advisor Ronald Filler obtained the testimony of Mr. Van Til [Ex. R13(B)]

ing that issue with the Committee and that Refco should not, and need not, get involved or submit evidence on the Holdings/Commodities Issue [R.Tr. 132–33, 212]. Asher had given the same advice to Bennett when the two of them met after April 1987 [R.Tr. 37–38, 77].

Asher also repeatedly represented to Weinberg that the claims of Refco and Drexel with respect to the Holdings/Commodities Issue were being considered "in tandem" [R.Tr. 138, 175].

Asher never informed Weinberg that the Committee required Refco to submit evidence on the Holdings/Commodities Issue [R.Tr. 134–35]. To the contrary, Asher repeatedly told Mr. Weinberg that Refco should *not* get further involved in the Committee's examination of the Holdings/Commodities Issue because the matter was being pursued fully by Drexel and that Refco's involvement would impede, rather than facilitate, the Committee's decision [R.Tr. 135, 152, 175, 226].

Asher never told Weinberg that the Committee's review of Refco's proof of claim was being "tabled" or held in abeyance pending a determination of the Holdings/Commodities Issue [R.Tr. 134]. To the contrary, Asher led Weinberg (and Bennett) to believe that there was no issue as to whether Refco had a proper claim [*Id.* at 37–38, 77, 134].

Asher, who testified at the hearing, did not deny the foregoing conversations with Weinberg and Bennett. Nor did Asher deny making the representations attributed to him [R.Tr. 237–38].

Based on Asher's continuing representations, Refco determined to grant the Committee's repeated requests for adjournments of the United States Action [R.Tr. 39–40, 135, 212]. Refco reasonably relied upon Asher's representations and determined that Refco need not take any further action to insure that the Committee was adjudicating Refco's claim [R.Tr. 145].

It is undisputed that during the three year period following Refco's completed submission of its claim in April 1987, not once did the Committee or Asher inform Refco of what the Committee told Refco in February 1990, at Asher's instigation—that (a) there were "open" issues other than the Holdings/Commodities Issue that had yet to be decided, and (b) the Committee had not been proceeding to adjudicate Refco's claim [Ex. R13].

Had Refco known the true facts, it would never have (a) consented to the adjournments of the United States Action, or (b) relied, in good faith, on the representations by Asher, speaking for the Committee, that final disposition of Refco's claim was imminent. Had Refco known the true facts, it would not have relied on Asher's representations that Refco should not get actively involved in Committee proceedings relating to the Holdings/Commodities Issues because Drexel was dealing with the Issue and Refco's involvement would only delay matters.

F. **For Nearly Three Years After Refco's Full Submission to the Committee, Refco Waited in Vain for a Decision on Its Claim and Then Advised Asher That It Would No Longer Adjourn the United States Action**

In January 1990, facts first came to Refco's attention which revealed that the Committee had not been dealing with Refco's substantive claim or the Holdings/Commodities Issue expeditiously or in good faith [R.Tr. 202].

In late December 1989 or early January 1990, Asher first informed Weinberg that the Committee had recently retained the London, England accounting firm of Spicer & Oppenheim ("Spicer") to prepare a report to the Committee (The "Spicer Report") on the Holdings/Commodities Issue [R.Tr. 139–40].[6]

After almost three years of representations by Asher that Refco's claim would be resolved "imminently" and that a final de-

---

6. Spicer had been retained by the Committee in July 1989, some six months before Asher first

advised Weinberg of that fact [Ex. R32(C)].

termination was "around the corner," Asher's information with respect to Spicer made clear that a determination was not imminent and that the Committee was, in fact, delaying a determination of Refco's claim [R.Tr. 138–39].

Refco determined that the adjournments had gone on for too long and that it was time to end the extensions [R.Tr. 40–41, 84–86, 139]. Therefore, in January 1990, Weinberg informed Asher that there would be no further adjournments of the United States Action [R.Tr. 138–39].

### G. Asher Attempted to Justify the Committee's Unconscionable Delay By Advancing Baseless New Issues

In response to Weinberg's advice that the United States Action would not be adjourned further, and in complete contradiction to Asher's almost three years of representations, Asher immediately began to execute a plan calculated to excuse the Committee's unconscionable delay. Asher's plan, as evidenced by his own letters, was to cause the Committee to create further delay by engaging in a fishing expedition to discover defenses to Refco's claim [Ex. R13(B); R.Tr. 41].

Thus, by letter dated January 15, 1990 ("Asher's January 1990 Letter"), Asher advised the Committee that Refco intended to pursue its remedies in the United States Action and recommended that the Committee take certain alternative actions with respect to Refco's claim, including raising substantial defenses to Refco's claim which were not previously raised [Ex. R13(B) ].

Asher's January 1990 Letter admitted that the Committee had not considered Refco's claim [Ex. R13(B) ]. Thus, Asher instructed the Committee that it should "give more immediate consideration to the need and appropriateness for *resuming* the Committee's review of Refco's receivership claims" [*Id.*] (emphasis supplied).

Asher's January 1990 Letter belied Asher's representation to Refco that the Refco and Drexel claims were being considered "in tandem" [R.Tr. 175–76, 226]. Asher's January 1990 Letter stated that "the Committee should give more immediate consideration to the need and appropriateness . . . to coordinating its review of the Refco and Drexel claims" [*Id.*].

Asher's January 1990 Letter also alleged for the first time [R.Tr. 96, 151], that issues remained "open" with respect to Refco's claim [Ex. R13]. Asher asserted that Refco had not provided "substantial information" with respect to Galadari's suitability to trade and Refco's alleged continuation of business with Galadari after Galadari incurred the debt. Asher also suggested to the Committee that Refco should be required to provide the Committee with the testimony of Max Van Til.

Before February 1990, neither the Committee nor Asher ever claimed that these alleged issues were "open" or that Refco was told that any of these issues was "open" [R.Tr. 146, 151, 154, 159, 212].

Asher's January 1990 Letter constitutes nothing more than a "last ditch" effort to fabricate an excuse for the Committee's (a) unconscionable lack of activity on Refco's claim, and (b) inability in over three years to decide the simple Holdings/Commodities Issue.

Each of Asher's assertions with respect to "open" issues is belied by the facts. Bennett has testified, without contradiction, that before February 1990, the Committee never requested information with respect to any issues alleged by Asher to be "open" [R.Tr. 46–47].

Bennett's February 21 and 22, 1987 testimony before the Committee [Ex. R6, R7], along with Refco's April 8, 1987 submission to the Committee [Ex. R32], addressed Galadari's "suitability to trade" and Galadari's claimed trading after the date of the debt [R.Tr. 44, 57].[7] After Refco's submission, the Committee never questioned that Refco's submission fully responded to the Committee' inquiry [R.Tr. 44].

Similarly, in February 1987, Bennett informed the Committee that Van Til's em-

---

7. In point of fact, Mr. Bennett and Refco informed the Committee that Galadari was not permitted to trade after his debt was incurred [Ex. R32].

ployment was terminated by Refco in 1984 and that Van Til was no longer under Refco's control [Ex. R7, p. 12; R.Tr. 45]. There is no evidence in the record of a Committee request that Refco produce Van Til for deposition. Indeed, Bennett and Weinberg testified without contradiction that the Committee never asked Refco to obtain Van Til's testimony [R.Tr. 45, 131–32].

The Committee has not submitted a single item of evidence to establish that either the Committee or Asher ever raised the allegedly "open" issues with Refco in the years following Refco's submission in 1987. Indeed, Asher did not contact Refco or its counsel regarding the alleged "open" issues before sending the January 1990 Letter to the Committee *ex parte* [R.Tr. 145, 151].

It is clear that Asher fabricated the alleged "open" issues.

Asher has testified that he drafted a memorandum (the "February 6, 1990 Memorandum") on Committee letterhead addressed to Bennett [Ex. R13; D.Tr. 381–84], pursuant to which Asher stated:

> The Committee is in complete agreement with Mr. Asher's comment to the effect that reactivation of Refco's New York lawsuit would serve no useful purpose . . .

[Ex. R13(A)]. Asher also directed Refco and Drexel to "comment with regard" to the matters raised by Asher in his January 1990 Letter (*Id.*)[8]

Asher's January 1990 Letter to the Committee and the Committee's February 6, 1990 Memorandum to Bennett were in bad faith and prompted solely by (a) Refco's refusal further to adjourn the United States Action, and (b) the Committee's and Asher's need to find excuses for the unconscionable delay in dealing with Refco's claim.

Following receipt of the February 6, 1990 Memorandum and Asher's January 1990 Letter, Weinberg contacted Asher and refuted the allegations raised therein [R.Tr. 146, 151, 154–55, 188, 222–25].[9]

Weinberg's communications, as Refco's attorney, with Asher, as representative of the Committee, were communications between Refco and the Committee.

The uncontradicted evidence in the record is that the Committee and Asher held Asher out to Refco as the Committee's attorney and representative. Indeed, Asher responded, on behalf of the Committee, to requests made directly to the Committee [Ex. R33, R12]. For years, Asher, on behalf of the Committee, sought adjournments of the United States Action, made representations to Refco regarding the Committee's proceedings in Dubai, and advised Refco with respect to the status of the Dubai proceedings.

Asher never told Refco that (a) Asher was not authorized to act on behalf of the Committee—indeed he was, (b) Asher would not inform the Committee of his conversations with, and representations to, Bennett and Weinberg, or that (c) communication to Asher were insufficient to record Refco's position [R.Tr. 128, 131, 173–74]. Prior to September 1990, Asher never informed Refco that it should communicate directly with the Committee [R.Tr. 242–43]. Indeed, Asher admitted that, at least since April 1988, he held regular communications with Weinberg, as Refco's counsel, and never once told Weinberg that communications with Asher was insufficient [*Id.* at 240–41].

## H. In Conjunction with Raising the New "Open" Issues, Asher Removed the United States Action to this Court

As stated before, in January 1990, Weinberg informed Asher that Refco will cease granting adjournments of the Committee's time to answer or move against Refco's

---

8. Attached to the Committee's February 6, 1990 Memorandum, was Asher's January 1990 Letter and a Committee memorandum dated October 28, 1989 which included information about the Committee's retention of Spicer.

9. Asher's attempt to deny the conversation with Weinberg is specious. Asher testified that he had a conversation with Weinberg on the subject "several days after the filing of the notice of removal" [R.Tr. 239].

complaint in the United States Action [R.Tr. 155].

On March 27, 1990, Asher, on behalf of the Committee, removed the action to this Court. Thereafter, the Court denied Refco's motion to remand this action.

### I. Refco Continued Its Participation in the Dubai Proceedings and in the Action Pending in this Court

Once it was made clear to Refco that the Committee was not reviewing its claim and that Asher had misrepresented to Refco the status of the Committee's proceedings in Dubai, Refco sought to protect its interests by actively pursuing its claims in Dubai and in the action pending in this Court [R.Tr. 156–58].

In the Dubai proceeding, Refco sought actively to participate in the adjudication of the Holdings/Commodities Issue [R.Tr. 140–43, 156, 205]. Thus, after Refco learned that Spicer had released its report on the Holdings/Commodities Issue, Refco demanded a copy of the Spicer Report [R.Tr. 143]. Refco demanded also the right to participate in the examination of Paul Holden, the author of the Spicer Report [Ex. R34].

The Committee, however, did not comply with Refco's requests. The Committee failed timely to notify Refco of the proposed examination of Holden which was scheduled to take place in London. Thus, even after Refco notified the Committee, by letter dated November 7, 1990 [Ex. R34], that it wished to participate in the examination of Holden and demanded ten days notice to appear in London, the Committee failed to notify Refco of an examination which had been scheduled for November 27, 1990 [Ex. R35; R.Tr. 191–92].

On November 26, 1990, Refco discovered, by chance, that the examination had been rescheduled for the next day in London. By letter to the Committee dated *Sunday*, November 25, 1990 and telecopied to the Graubard office at *4:57 A.M.* [Committee Ex. 104], Asher revealed this fact. Refco never received prior notification from the Committee. Asher informed Refco's counsel that since he did not believe that the

examination would go forward on that day, he did not notify Refco of the date [Ex. R35]. Refco strenuously objected to the scheduled examination [*Id.*].

After three unilateral adjournments by the Committee, the examination of Holden eventually took place during the week of December 10, 1990. However, despite the fact that the Spicer Report admittedly bears upon Refco's claim, the Committee categorically denied Refco the right to cross-examine Holden with respect to the Spicer Report [Ex.R. 36]. The Committee allowed Refco only to be present. Thus, by letter dated November 5, 1990 [Ex.R. 36], the Committee instructed the examiner in London, as follows:

> We [Committee] refer to our letter of appointment to you [examiner] dated 3rd December, 1990 in which we appointed you as Commissioner to preside at the examination of Mr. Paul Holden. That letter listed those persons permitted to attend as far as the Committee are concerned at the examination. Included in that list were *Counsel to Refco, Inc. Their participation at the hearing is limited to that of observers only should they wish to attend.*

(emphasis supplied).

Refco's counsel attended the Holden examination in London and, thus, Refco participated in the resolution of the Holdings/Commodities Issue to the extent allowed by the Committee [R.Tr. 141–142].

### J. The Proceedings Before this Court and Asher's Continuing Manipulation of the Committee

By order dated January 4, 1991, this Court denied Refco's motion to remand the United States Action, consolidated Refco's action with the Drexel action and stayed the Refco action.

During January 16–18, 1991, the Court held a hearing on Drexel's motion to lift the stay [D.Tr.]. Refco participated and joined in that hearing. By Order dated January 28, 1991, the Court allowed Refco to submit its affidavits in support of its own motion to lift the stay.

Directly after the Drexel hearing, Asher advised the Committee of the schedule ordered by this Court in connection with the motions to vacate the stays [Ex. R37]. By letter dated January 25, 1991 [*Id.*], in an obvious attempt to head off a decision by this Court, Asher proposed to the Committee that Refco and Drexel be required to submit all additional papers on the Holdings/Commodities Issue by February 9, 1991. Asher urged the Committee also to finally resolve that issue [*Id.*].

Despite Drexel's objections that the deadline was unreasonable [Ex. R38], the Committee adopted Asher's proposal and set a February 9, 1991 deadline [Ex. R39]. In response to Weinberg's letter objecting to such a deadline [Ex. R40], the Committee extended the deadline by a mere two weeks [Ex. R41]. Drexel requested that the Committee extend the unreasonably short deadline [Ex. R42], but the Committee refused the request [Ex. R43].

Both Refco and Drexel timely submitted to the Committee their responses to the Spicer Report on the Holdings/Commodities Issue. On or about February 19, 1991, Drexel submitted the report of Price Waterhouse [Drexel Ex. CC]. By letter dated February 22, 1991, Refco submitted its response to the Spicer Report [Ex. R44; R.Tr. 143, 168–72].

K. The Testimony Adduced at the Refco Hearing Before this Court

Asher repeatedly represented to Refco that the disposition of its claim was subject only to the Committee's decision of the Holdings/Commodities Issue, that Refco's interests were being considered together with Drexel's interests and that Refco's position would best be served if its were to permit the Holdings/Commodities Issue to be resolved without Refco's active involvement.

During the period from April 1987 to February 1990, the Committee and Asher let Refco believe that the only remaining issue was the Holdings/Commodities Issue.[10]

The Holdings/Commodities Issue was an uncomplicated issue that could and should have been decided shortly after it was identified to Refco in February 1987. *see* Opinion Re Vacating Stay at pp. 7–8. Yet, to date, the Committee has not resolved that Issue.

The delay in resolving the Holdings/Commodities Issue was motivated by the desire of the Committee and Asher, among others, to find a way for resolving the Issue in a way that would deny Refco recovery of its claim.

This Court rejects the Committee's belated and self-serving argument that the Committee has not determined Refco's claim because of the Committee's unilateral and undisclosed decision to focus solely upon the Holding/Commodities Issue before deciding other "open" issues that had not previously been disclosed to Refco.

As evidenced by the testimony of Bennett and Weinberg, the Committee never informed Refco that Refco's substantive claim was not going to be considered until *after* the determination of the Holdings/Commodities Issue [R.Tr. 45–46, 34]. To the contrary, Asher purposely created the impression that Refco's claim had been resolved and that the only issue remaining was whether Refco's claim would be paid out of the assets of both Holdings and Commodities or only Commodities [R.Tr. 37–38, 77, 134]. At no time did the Committee or Asher tell Refco that Commodities does not have sufficient assets with which to pay Refco's claim. [R.Tr. 134].

Moreover, this Court rejects the Committee's argument that any one issue, including the Holdings/Commodities Issue, would justify the inordinate four years of delay that has taken place. The Committee had more than ample time to resolve any issue regarding Refco's claim if the Committee and its advisors, particularly Asher, had acted in good faith.

---

**10.** Indeed, that was the only legitimate open issue. The additional "open" issues, first raised with Refco in February 1990, were concocted by Asher as a device further to delay the disposition of Refco's claim.

For example, from April 23, 1987 to August 10, 1987 (after Refco's submission to the Committee), there was not one submission to the Committee on the Holdings/Commodities Issue. *See* Drexel Ex. DD. From August 1987 to January 17, 1988, nine professional opinions and Drexel's Proposed Findings on the Holdings/Commodities Issue were submitted to the Committee [*Id.*]. From January 17, 1988 to January 24, 1989, only three professional opinions were submitted (as well as Asher's proposed findings and Drexel's supplemental findings) [*Id.*]. It is clear that during the two year period that elapsed following the full submission of Refco's claim, in April 1987, the Committee had more than enough time to decide, and enough opinions on which to base a decision of, the Holdings/Commodities Issue and Refco's claim.

It is utterly unacceptable that the Committee did not decide the Holdings/Commodities Issue and Refco's claim during the one and one-half year period, from January 1989 to June 1990, during which there was not one submission to the Committee on the Holdings/Commodities Issue.

The Committee's last minute and self-serving proffer, that it intends to determine the Holdings/Commodities Issue by April 15, 1991, is insufficient to overcome the overwhelming evidence of the Committee's unconscionable and prejudicial delay in reviewing Refco's claim and the Holdings/Commodities Issue.

In this connection, the Court notes that the Committee for the first time set a date for its decision immediately *after* this Court stated on the record, at the hearing held on March 18, 1991, that it is of the opinion that the Committee has been unduly delaying its determination of the claims [R.Tr. 109]. This Court finds that

the Committee's action is not mere coincidence, but represents a transparent effort, engineered by Asher, to avoid the consequences of the Committee's own delay.[11] Indeed, Asher drafted the Committee's March 19, 1991 Memorandum to this Court [Opinion Re Vacating Stay, p. 7].

In spite of the Committee's continuing representations to Refco that only the Holdings/Commodities Issue remained to be resolved before Refco's claim would be paid, Asher caused the Committee to inform Refco in February 1990, and Asher represented to the Court on March 19, 1991 [R.Tr. 291–92], that there are numerous issues which remain to be resolved before Refco can be paid. Thus, Asher listed for the court "open issues" which Asher stated he "would urge the Committee to consider," including suitability of Galadari to trade, mitigation of damages, and limitation of Galadari's liability [*Id.*].[12]

The Committee has not offered any reasonable explanation to the Court as to why the issues were not previously resolved. It appears that Asher has raised these defenses to Refco's claim solely to delay any resolution of Refco's claim.

This Court finds that Asher conjured up the alleged "open" issues and that, as to Refco, the Committee's delay is unconscionable, prejudicial and constitutes a denial of due process.

L. The Committee Has Not Acted as an Impartial Tribunal with Respect to Refco's Claim. The Committee's Determination of the Holdings/Commodities Issue Has Been Plagued by Bias

Apparently faced with a record which presented the Committee with no credible alternative but to rule that Commodities is a division or subsidiary of Holdings (*i.e.*, in favor of Drexel and Refco), the Committee and its advisors, including Asher, set out to

---

11. The Court notes also that, as evidenced by the correspondence initiated by Asher on January 25, 1991 [Ex. R37], since the date of the hearing on Drexel's motion to lift the stay, the Committee, through Asher, has been engaged in a campaign to determine the Holdings/Commodities Issue before this Court could rule.

12. It must be noted that the issue of limitation of Galadari's liability was raised by Asher for the first time in open court on March 19, 1991. That issue had not been raised even in Asher's letter to the Committee in January 1990.

orchestrate an opinion to the contrary. In this connection, it is undisputed that the Committee retained Spicer *ex parte* to opine on the Holdings/Commodities Issue [Ex. R13(C); R.Tr. 140]. It is undisputed also that Refco and Drexel were denied the right to participate in retaining and instructing Spicer [*Id.*].

Although the Spicer Report was issued on June 21, 1990, Refco was not provided with a copy of the report until some three months later, on September 28, 1990 [Ex. R14; R.Tr. 142]. And, as noted above, Refco was denied the right to examine Spicer [Ex. R35].

Moreover, the Committee could not render its decision four weeks after receipt of the Richards Butler opinion (after waiting years to determine the issue), unless the Committee had already decided to adopt the Richards Butler opinion in its entirety. It can be fairly assumed that the Richards Butler report and any opinion based thereon determine the Holdings/Commodities Issue adversely to Refco and Drexel.

In this connection, it is noted that the Committee has denied Refco and Drexel the rights to (a) review the Richards Butler report and (b) examine Richards Butler on the report [Ex. R43; R.Tr. 177–78].

On January 17, 1991, John Emmott of Richards Butler testified before this Court that Richard Butler's role is "to assist the Committee in collating the evidence in the record [on the Holdings/Commodities Issue] and assist the Committee in reaching its decision" [D.Tr. 336]. Emmott stated that Richards Butler would review the record and render an opinion to the Committee [*Id.* at 339].

This Court finds that Richards Butler's role is no different from that of the other professionals who have submitted opinions on the Holdings/Commodities Issue. As such, the Richards Butler report is not privileged and should have been disclosed to Refco and Drexel. The Committee's refusal to produce this report violates the due process rights of Refco and Drexel.

The Committee's participation in shaping evidence and orchestrating an opinion adverse to Refco on the Holdings/Commodities Issue has denied Refco due process.

*The Committee Improperly Abdicated its Functions to Asher and Richards Butler*

It also appears to this Court that Asher is the Committee. *See* R.Tr. 230:3–9.

That Asher is the Committee is demonstrated further by the memorandum to this Court, dated March 19, 1991, which purports to be on the Committee's letterhead. *See* Opinion Re Vacating Stay at p. 7. At the hearing on March 18, 1991, this Court noted as follows:

I'm not going to decide the [Holdings/Commodities] issue. I just want to know what is taking so long and why every time you come here you tell me it is about to be decided.

As the plaintiffs point out, four years ago, you said in a couple of months it will be decided.

And here we are four years later and you're telling me the same thing, somebody is considering this and will report on it sometime.

Now if that isn't foot-dragging, I don't know what is.

[R.Tr. 109:5–15].

The very next morning, counsel for Refco and Drexel both received by telecopy purportedly from the Committee, a copy of the March 19, 1991 Memorandum. That memorandum was the first communication by the Committee to this Court and represented that the Holdings/Commodities Issue will be resolved by April 15, 1991 [R.Tr. 229]. The Committee did not telecopy the memorandum to the Court directly. The Court first saw that communication on the afternoon of March 19, when Asher engaged in a charade and sought to make a production of confronting Weinberg with the memorandum on cross-examination.

Asher testified that he obtained the Committee's March 19, 1991 memorandum to the Court as a result of his *ex parte* communication with the Committee and his insistence that the Committee respond to the Court's expressed unhappiness with the Committee's proceedings. Asher testified

that he in fact drafted the Committee's memorandum [R.Tr. 230–31, 244–45].[13]

### M. The Committee Impermissibly Has Permitted Its "Legal Advisors" to Act as Litigants Against Refco

The Committee is charged with deciding Refco's claim as a quasi-judicial body. As such, the Committee must be impartial.

The Committee's "legal advisors," Asher and Richards Butler, function in a capacity equivalent to that of a judge's law clerks. As such, they too must be impartial.

As set forth above, in violation of his trust, Asher repeatedly over the years has taken actions which demonstrate that he is biased against Refco and seeks to impede Refco's claim. Nevertheless, Refco must appear before the Committee which is instructed and counseled by Asher. In addition, Refco must litigate against the Committee, represented by Asher, in the United States Action.

Also, as set forth above, it is undisputed that the Committee has delegated the responsibility for rendering a determination on the Holdings/Commodities Issue to Richards Butler.

The Committee's dealings with, and abdication to, Asher and Richards Butler would not be condoned if the Committee were a United States judge. No judge charged with deciding Refco's claim could permit the judge's law clerk to advise the judge and, at the same time, act as the attorney for Refco's adversary. This Court finds that such objectionable judicial conduct has been taking place in the Dubai proceeding. The Committee, which must determine Refco's claim, has permitted its "law clerks", Asher and Richards Butler, to assume the role of adversary with respect to Refco.

### N. The Committee Impermissably Has Been Acting Both as Judge and Trustee

The Committee has been improperly assuming the dual roles of bankruptcy trust-ee, who is permitted to performa an adversarial role, and judge, who may not be adversarial and is charged with being strictly impartial.

\* \* \* \* \* \*

In sum, the evidence demonstrates the Committee has failed to perform its charge impartially and Refco has been denied due process.

## CONCLUSIONS OF LAW

This Court concludes that Refco has met its burden of proving that the Dubai proceedings have not comported with our notions of due process and fundamental fairness. Refco has been denied due process and has been treated unfairly as evidenced by (a) the Committee's unconscionable and prejudicial delay in considering Refco's claim, (b) the Committee's lack of impartiality in purporting to resolve the Holdings/Commodities Issue, (c) the denial to Refco of basic fundamental rights, including the right to cross-examine witnesses, (d) the Committee's abdication of its fact finding and decision making functions to its "advisors", including Asher, who are not impartial, (e) the Committee permitting Asher and Richards Butler to assume the dual roles of law clerks to the Committee and adversaries to Refco, and (f) the Committee improperly assuming the dual roles of bankruptcy trustee, who is permitted to perform an adversarial role, and judge, who may not be adversarial and is charged with being strictly impartial.

### A. The Committee's Unconscionable Delay In Adjudicating Refco's Claim Has Denied Refco Its Due Process Rights

Almost seven years ago, Refco timely submitted its formal proof of claim against Galadari and Commodities to the Committee. Almost four years ago, Refco fully submitted evidence in support of its claim to the Committee. The Committee has not decided a single issue relating to Refco's claim since the claim was filed in 1984.

---

**13.** This Court rejects the Committee's argument that Refco somehow has waived the right to object to Asher's improper role. The testimony demonstrates that prior to 1990, Asher's true role was not made known to Refco [R.Tr. 182–85].

To date, the Committee has failed to decide Refco's claim. The Committee has failed also to decide the Holdings/Commodities Issue.

In January 1990, after Refco indicated to Asher that the Committee's inaction had gone on far too long and that Refco would no longer adjourn the United States Action, Asher, on behalf of the Committee, began to raise new issues and defenses in connection with Refco's claim. Asher disingenuously designated these issues as "open" [Ex. R13(B)]. The Committee has not offered any explanation for its failure to decide Refco's claim and to resolve the alleged "open" issues in the four years since Bennett first traveled to Dubai to meet with the Committee.

■ This Court has held that "at minimum, the Committee owes ... the same duty a bankruptcy trustee in this country owes a creditor" Opinion Re Vacating Stay, p. 21. A trustee in bankruptcy has the duty to close the estate expeditiously. *See* 11. U.S.C. § 704(1); *Zimmerman v. Farmington Shoe Co.*, 31 F.2d 405, 406 (1st Cir.1929) (creditors entitled to final distribution within one year); *In re Derryberry* 72 B.R. 874 (N.D.Ohio 1987); *In re Island Amusement Inc.*, 74 B.R. 18 (D.P.R.1987). *See also* Opinion Re Vacating Stay, p. 20.

The Committee argues that taking seven years to decide the Refco and Drexel claims comports with our notions of due process. The Committee is wrong. This Court will not countenance delay of creditors' claims *ad infinitum*. The decisions cited by the Committee are inapposite. For example, in *Isaacs v. Brown*, 865 F.2d 468 (2d Cir.1989), the court did not address delay and lack of due process in the context of a determination of a creditor's claims in a bankruptcy proceeding. Rather, *Isaacs* addressed the issue of delay in adjudicating entitlement to medicare benefits. Moreover, the court in *Isaacs* recognized that "delay can be so unreasonable as to deny due process, such as when it is inordinately long ..." 865 F.2d at 477. Such is the case here.

This Court rejects also the Committee's attempt to justify its delay in resolving Refco's claim by asserting that the alleged deliberations on the Holdings/Commodities Issue have precluded the review of Refco's claim. The Committee offered no testimony demonstrating the effort, if any, made by the Committee to resolve Refco's claim. Further, the Holdings/Commodities Issue cannot justify years of delay in adjudicating Refco's claims. This Court has held that:

> For the last four years, the Committee has not determined this relatively simple issue [*i.e.* Holdings/Commodities]. This delay has persisted in spite of the fact that the Committee has before it twenty-one different opinions regarding the issue (Drex.Exh. DD), including an opinion by the Committee's own special advisor, a Mr. Filler, who concluded *in 1989* that Commodities was a division of Holdings, and reports from accountants to the same effect.
>
> Notwithstanding these several opinions and substantial evidence in support of Drexel's contention that Commodities was a division of Holdings, the Committee has not decided the Commodities/Holdings issue. In 1986, this court was advised that a decision on this issue was only a few months away. This court has been given no satisfactory explanation as to why this issue has not been decided in the past four years by the Committee

Opinion re Vacating Stay, pp. 6–7 (emphasis supplied).

It is clear that the Committee's inordinate delay in determining Refco's claim does not conform to notions of due process under the United States Bankruptcy Code which requires creditors' claims to be determined expeditiously. Accordingly, Refco has been denied due process of law and, thus, the Dubai proceedings are no longer entitled to comity and the stay should be vacated.

B. The Purported Resolution of the Holdings/Commodities Issue has Not Afforded Refco Due Process

The Committee's *ex parte* retention of Spicer as an alleged "independent" expert

on the Holdings/Commodities Issue similarly has denied Refco the right to due process.

It is undisputed that determination of the Holdings/Commodities Issue is crucial to Refco's ability to get full payment of its claim.

The Committee does not dispute that it (a) appointed Spicer, *ex parte,* as an "independent" expert, (b) did not give Refco notice .of Spicer's appointment until six months later, (c) did not afford Refco the opportunity to participate in formulating the scope of the assignment or in providing documentation to carry out the assignment, (d) did not provide Refco with an opportunity to review the instructions to Spicer, (e) did not provide Refco with a copy of the Spicer Report until three months after it was provided to the Committee, (f) failed to provide Refco with adequate notice of the cross-examination of the "independent" expert, Holden, and (g) failed to permit Refco to examine Holden.

### Refco Was Denied the Right to Cross–Examine Holden and Richards Butler

It is undisputed that the Committee categorically denied Refco the right to cross-examine Holden, the author of the Spicer Report [Ex. R35].

The Committee has also denied Refco the right even to review the Richards Butler report (which is based upon the conclusions reached by the Spicer Report) let alone to cross-examine Richards Butler [Ex. R38, R43].

The right to confront and cross-examine witnesses is a fundamental due process right. *Lidy v. Sullivan,* 911 F.2d 1075 (5th Cir.1990); *Coffin v. Sullivan,* 895 F.2d 1206, 1211 (8th Cir.1990). Thus, the Committee's denial of Refco's right to cross-examine witnesses has denied Refco due process.

For example, Refco was denied the opportunity to discover what Richards Butler stated to Spicer with regard to the impact of the Spicer Report on Refco's claim. Holden's notes reflect that *Richards Butler stated that "creditors other than UBME and D[rexel] do not count"* [Drexel Ex Z]. Refco was denied the opportunity to discover the facts surrounding this prejudicial statement.

The Committee argues that the denial to Refco of this fundamental right is not prejudicial because Drexel cross-examined Holden and Refco's attorneys "presumably had adequate opportunity to confer with counsel for Drexel if they wished to ensure that any particular question was asked of the witness" (Committee's Memorandum of Law, p. 28). This Court rejects the Committee's argument.

The Committee argues that so long as Drexel, a party with a similar interest in the Holdings/Commodities Issue, was allowed to cross-examine Holden, Refco has not been denied due process. The Committee is wrong.

The Committee misplaces its reliance on caselaw which relates to an exception to the hearsay rule, not to the right to cross-examine witnesses. Thus, the Committee's cases hold that when a witness, who has formerly given testimony, is not "available" at a trial and a "predecessor in interest" had the opportunity with similar motive to develop testimony, the former testimony is admissible, as a hearsay rule exception, against the successor party who did not cross-examine the witness. *See Lloyd v. Am. Export Lines, Inc.,* 580 F.2d 1179, 1184–85 (3d Cir.), *cert. denied,* 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978); *Clay v. Johns–Manville Sales Corp.,* 722 F.2d 1289, 1294 (6th Cir.1983), *cert. denied,* 467 U.S. 1253, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984). Such is not the case here.

Even if Drexel had a similar motive in examining Holden, Holden is not, and was not on December 10, 1990, "unavailable" within the meaning of Rule 804(b)(1), Fed. R.Evid. Refco was allowed to be present at the Holden examination, but was categorically denied the right to cross-examine Mr. Holden.

The Committee's reliance on *U.S. v. Casemento,* 887 F.2d 1141, 1173 (2d Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1138,

107 L.Ed.2d 1043 (1990), similarly fails to support the Committee's position. In that case, the defendants objected to use at trial of a transcript of a deposition previously taken where counsel for defendants were given the opportunity to cross-examine the witness but counsel failed to take full advantage of that opportunity. Thus, the Court concluded that defendants were given the fundamental right to "an opportunity for effective cross-examination." 887 F.2d at 1173. By contrast, here, the Committee denied Refco the fundamental right to an opportunity to cross-examine Mr. Holden.

The Committee's refusal to allow Refco to cross-examine Spicer and Richards Butler has violated Refco's due process rights.

### C. Refco Has Not Waived its Right to be Accorded Due Process

This Court rejects the Committee's argument that Refco has waived its right to due process and waived its right to an expeditious resolution of its claim.

For a period of three years after Refco, in February and April 1987, provided all the information sought by the Committee, the Committee did not request any further information from Refco and did not indicate that Refco's submission was incomplete. Moreover, during that period the Committee's counsel, Asher, led Refco to believe that only one open issue existed with respect to Refco's claim [R.Tr. 134]. Over a three-year period Asher represented to Refco that the only issue to be decided was the Holdings/Commodities Issue. Based on Asher's representations, Refco agreed to adjourn the United States Action.

Once Refco indicated that the adjournments had gone on for too long, Asher raised new issues and defenses to Refco's claim.

█ The Committee now suggests that Refco has been less than diligent in pursuing its claim. The Committee's argument suggests that a creditor may not rely on a representation of a judicial body, but rather, must independently investigate the judicial body's activities and truthfulness of its representations. The Committee's assertion is absurd.

This Court finds that Refco reasonably relied on Asher's representations. This Court finds also that Refco's reliance does not constitute a knowing waiver of its due process rights. The Committee cannot induce a creditor's reliance upon its representation to its detriment and thereafter attempt to capitalize on that good faith reliance by claiming that the creditor has waived fundamental due process rights.

Had Refco known, or been informed, that the Committee was not proceeding to adjudicate Refco's claim, Refco never would have (a) consented to the numerous adjournments granted in the United States Action or (b) relied in good faith on the Committee's representations that Refco's claim was being processed.

It is well-settled that:

> to establish an implied waiver, there must be a clear, unequivocal and decisive act of a party showing such a purpose.

*Lamborn v. Dittmer*, 873 F.2d 522, 529 (2d Cir.1989). The Committee has not demonstrated that Refco knew or should have known that the Committee had not reviewed its claim or that defenses were yet to be concocted by Asher. Rather, the Committee through Asher, concealed the Committee's true agenda: further delay of Refco's claim. Thus, Refco has not waived its right to due process.

The Committee's reliance on Bankruptcy Rule 7041 and *In re Carlton F. Stowe, Inc.*, 8 B.R. 228 (Bankr.W.D.N.Y.1981) to support its claim of waiver, is unavailing. The facts of *In re Carlton* are completely unlike those presented here. In that case, the court did not address the issue of delay in adjudicating a creditor's claim. The court determined only that when the creditor's principal refused to comply with a court order directing him to return to court to complete his trial testimony and to produce books and records, the creditor's claim would be dismissed for want of prosecution, failure to prove a *prima facie* case and failure to obey court orders. Similarly, Bankruptcy Rule 7041 concerns dismissal

for "want of prosecution." Such is not the case here.

### D. The Committee's Improper Abdication of its Powers To its Biased "Legal Advisors" Has Denied Refco Due Process

The Committee acknowledges that Decree No. 3 of 1984 explicitly prohibits the Committee from delegating to any appointed advisor the power to admit or compromise creditors' claims. *See* Drexel Exhibit S, ¶¶ 7(e) and (k).

To the extent that the Committee is a judicial body entrusted to adjudicate Refco's claim our notions of due process prohibit a judicial body from delegating to a person who is outside the court system the powers of fact-finding or ultimate decision making. *See, e.g., Kimberly v. Arms*, 129 U.S. 512, 524, 9 S.Ct. 355, 359, 32 L.Ed. 764 (1889); *Reilly v. United States*, 863 F.2d 149, 157 (1st Cir.1988).

In spite of this clear prohibition, the record demonstrates that the Committee has permitted its advisors to act in a manner which effectively delegates to them the power to admit or deny Refco's claim. Moreover, it appears to this Court that the Committee's advisors are biased and have set out to orchestrate a finding adverse to Refco. This Court finds that the Committee's appointments of biased "legal advisors" is offensive to our notions of fundamental fairness and due process.

The Committee has improperly delegated its duties to Asher. Indeed, it appears to this Court that Asher is a *de facto* Committee member. *See, e.g.,* Opinion Re Vacating Stay at pp. 5, 9.

*The record makes clear that when the Committee issues pronouncements it is, in reality, Asher's voice, and that when the Committee writes letter it is, in reality, Asher's pen.*

Asher has testified that he drafted virtually all of the Committee's correspondence concerning the Refco and Drexel claims [D.Tr. 371]. From 1986 to 1989, Asher apparently acted as the Committee's decision-maker with respect to Drexel's claim by directing the conduct of the proceedings (Drexel's Proposed Findings, pp. 33–34). Asher similarly has directed the Dubai proceedings with respect to Refco's claim. Indeed, Asher actively questioned Bennett, together with Committee Chairman Rostamani, when Bennett appeared before the Committee on February 21 and 22, 1987.

Asher's control and direction of the Committee is further exemplified by the fact that, when Asher learned that Refco would no longer adjourn the United States Action, Asher engaged in an *ex parte* communication with the Committee and advised the Committee by letter, *inter alia*, of alleged defenses to Refco's claim. Asher then drafted the Committee's memorandum to Refco which directed Refco to respond to Asher's letter [D.Tr. 382–84].

In January 1991, Asher again directed the Committee's decision by urging the Committee to set an unreasonably early deadline for Refco to submit to the Committee its response to the Spicer Report.

Asher engaged in further *ex parte* communications with, and control of, the Committee when he drafted the Committee's memorandum to this Court, dated on March 19, 1991. In that memorandum, Asher wrote for the Committee that "the Committee intends to reach a decision on or before April 15, 1991 in the claims which [Drexel and Refco] have filed or asserted against Holdings." Opinion Re Vacating Stay, p. 7.

The Committee also has improperly delegated its duties to Richards Butler. In addition, the facts demonstrate that Richards Butler unilaterally retained Spicer solely in an effort to orchestrate an expert report on which Richards Butler could then rely to support its predetermined conclusion that Commodities is not a division of Holdings. *See* Opinion Re Vacating Stay at pp. 11–15 ("the Committee's effort to procure evidence for the purpose of resisting Drexel's claim is wholly inconsistent with the impartial role a judicial or a quasi-judicial body must play").

Mr. Emmott of Richards Butler testified that the Committee had instructed Richards Butler to review all of the evidence

and to "render an opinion" to the Committee on the crucial Holdings/Commodities Issue [D.Tr. 338–39]. The Drexel Proposed Findings fully set forth the extent to which Richards Butler directed and shaped the substance of the Spicer Report Richards Butler also "will probably be asked to write [a] draft judgment" [Drexel Ex. Z]. Richards Butler now has provided the Committee with its report on the Holdings/Commodities Issue.

With respect to Richards Butler, the Committee argues that courts may rely on experts without involving the parties (Committee's Memorandum of Law, p. 18). The Committee misplaces its reliance on *Reilly v. United States, supra,* 863 F.2d 149. In that case, the court distinguished between a court's retention of expert witnesses and technical advisors. The *Reilly* court held that while expert witnesses appointed pursuant to Rule 706 may opine on the evidence or contribute evidence, technical advisors are called upon to make *no* findings and to supply no evidence. 863 F.2d at 156. The court further held that the appointment of a technical advisor should be reserved for "truly extraordinary" circumstances and is called upon to assist the court in understanding extremely complex issues, not to undertake an "independent mission" of finding facts. 863 F.2d at 156–57. Moreover, the court stated that a court may not "abdicate" its duty to the technical advisor to determine the controversy presented. 863 F.2d at 157.

Here, Richards Butler is clearly an expert witness. Richards Butler is not qualified to practice law in Dubai. Emmott of Richards Butler has testified that Richards Butler has not given the Committee "any advice concerning legal matters" [D.Tr. 335–36]. Richards Butler has gathered evidence, drafted an opinion on the Holdings/Commodities Issue and will draft the Committee's judgment determining the controversy presented. Richards Butler, thus, does not qualify as a technical advisor, but rather as an expert witness to whom the Committee has improperly abdicated its responsibility to make "findings." As such, the Committee's use of Richards Butler is governed by Rule 706, Fed.R.Evid.

The Committee, in effect, argues that it would be permissible under United States law for a judge to permit her law clerk to render "impartial" advice to the judge and draft judicial opinions in a proceeding before the court, while at the same time acting as an adversary against a party in that proceeding concerning the very same issues of fact and law. The Committee simply is wrong. Such conduct is not countenanced in the United States and this court will not countenance such conduct elsewhere.

No judge of this Court would condone a proceeding where the judge's law clerk at once assists the judge in deciding a case and represents one of the parties to that case. Yet this is precisely what has been occurring in Dubai. The net effect of this charade is that Refco is forced to litigate its claim *before* the Committee, who finally determines the claim, while litigating *against* the Committee in this proceeding and in Dubai through the Committee's advisors who have actively taken positions adverse to Refco. The Committee miserably fails to avoid even the appearance of impropriety. Indeed, the cards are so stacked against Refco that Refco cannot be afforded a fair hearing.

The Committee has offered no evidence to refute the evidence that Richards Butler and Asher are *de facto* Committee members who determine the Committee's actions.

The Committee's conduct in abdicating its decision making functions to biased "advisors" violates not only its own rules, but also United States law and public policy. Thus, the Dubai proceedings are not entitled to international comity.

E. Refco's Objections to the Committee's Appointments of Asher, Richards Butler and Spicer are Timely

The Committee attempts to justify its conduct by arguing that Refco's objection is untimely (Committee's Memorandum of Law, pp. 16–19). The Committee's argument is insupportable.

Refco was not aware of the extent to which Asher unduly influenced and directed the Committee with respect to Refco's claim until Refco's action was consolidated with the Drexel action in January 1991.

Prior to 1991, Refco was not on notice as to the extent of Asher's role in directing the Committee in the Dubai proceedings. Indeed, Asher concealed his true role from Refco. Neither the Committee nor Asher have pointed to any document in Refco's possession pursuant to which Refco knew or should have known that Asher was unduly influencing the Committee to the prejudice of Refco. Indeed, neither the Committee nor Asher notified Refco of the extent of Asher's participation in Dubai.

As soon as Refco became aware of the facts which pointed to Asher's inherent conflict of interest in acting as an advisor to an alleged impartial tribunal, Refco immediately moved this Court to vacate the stay of proceedings.

Nor was Refco aware until January 1991, of the fact that Richards Butler instructed and directed Spicer in the preparation of Spicer's report to the Committee on the Holdings/Commodities Issue. The Committee has offered no contrary evidence.

Similarly, Refco's objections to the Committee's appointments of its expert witnesses, Spicer, and its legal advisor, Richards Butler, are timely.

It is undisputed that the Committee failed timely to notify Refco of the appointment of Spicer as a purported "independent" witness. Moreover, the Committee never notified Refco of the appointment of Richards Butler. After Refco was made aware of their appointment Refco has expressed its opposition.

The Committee argues that Refco should be bound by the time limits set forth in 28 U.S.C. § 455(a) for seeking recusal or disqualification. The Committee fails to demonstrate how Refco is bound by § 455(a) in Dubai. Moreover, under the circumstances, Refco's objections to the Dubai proceedings with respect to Asher's dual role are timely.

The Committee's further argument that Refco should have objected to appointments of which it had no notice, or of which Refco was not apprised of the true facts, is ludicrous. Accordingly, the Committee's reliance on cases in which a creditor failed to object within a reasonable time after receiving notice is misplaced.[14]

## F. Fundamental Principles of Fairness Prohibit A Bankruptcy Tribunal From Acting As Both Judge and Trustee

In 1987, this Court expressed the view that the proceedings in Dubai will be conducted substantially in accordance with bankruptcy procedures in the United States. (Findings of Fact, January 29, p. 75). United States Bankruptcy Law requires that the functions of a trustee be separate and distinct from that of the presiding judge. For example, under a Chapter 7 liquidation, a trustee is appointed to marshall and administer the assets of the bankrupt's estate.[15] The trustee, as a primary matter, determines which creditor's claims are to be "admitted" and what portion thereof is to be paid from the estate. However, any challenge by the trustee to a creditor's claim must be decided by the bankruptcy court. And, the trustee's liqui-

---

**14.** The Committee argues also that this Court should not entertain Refco's motion because Refco allegedly failed to exhaust the remedies available to it in the Dubai proceeding (Committee's Memorandum of Law, pp. 25–26). The Committee relies on cases which hold that an administrative decision may not be reviewed until final. The Committee's argument is absurd.

Refco is not appealing to this Court from an adverse administrative decision which is not yet final. Rather, Refco has properly challenged the propriety of continuing to defer to a foreign proceeding on the basis of comity. The Com-

mittee does not cite any authority for the proposition that, before a party may challenge a foreign proceeding in the United States on the basis of comity, the party must first object to the proceeding in the foreign tribunal. Indeed, no such authority exists.

Accordingly, the cases cited by the Committee regarding review of administrative decisions have no application here.

**15.** The Bankruptcy Code requires that trustees be appointed by a panel of private trustees and not by the court. 28 U.S.C. § 604(e).

2

dation must be approved by the bankruptcy court prior to the debtor receiving a final discharge from bankruptcy. 11 U.S.C. § 727(a); 4 *Collier on Bankruptcy,* ¶ 727.01, p. 727–5 (15th ed. 1990).

The trustee also is required to report and answer to the bankruptcy court on a periodic basis. Court approval is required prior to the trustee's retention of an attorney or an expert. 11 U.S.C. § 327(a); *Martin–Trigona v. Holtzman,* 551 F.Supp. 1378, 1383 (S.D.N.Y.1982); *In re Seatrain Lines, Inc.,* 13 B.R. 980, 981 (S.D.N.Y.1981).

In addition, the court must hear and determine creditors' objections with respect to their claims. 11 U.S.C. § 727; Bankruptcy Rule 3007; 4 *Collier on Bankruptcy, supra,* ¶ 727.14.

It is clear that, under United States law, a trustee may not serve in the dual capacity of judge and trustee. Thus, a system of checks and balances is used to protect the integrity of the process.

By contrast, this Court finds that the Dubai proceedings do not provide any similar protection to creditors. For example, the Committee acts both as trustee (collecting the assets of the estate and determining which claims are to be disputed) and as the court (determining which disputed claims are to be approved, the amount to be paid on each claim and whether to discharge the debtor).

This Court would not condone a bankruptcy proceeding where the judge were both the trier of the facts and law and the trustee. However, in Dubai, the Committee admittedly sits as both the trustee and judge. Thus, the Dubai proceeding does not adequately protect creditors or the integrity of the process and offends our notions of due process and fundamental fairness.

The evil inherent in the Committee's dual roles is compounded by the fact that the Committee has unilaterally appointed advisors, Asher, Richards Butler and Spicer. The Committee's appointees have proven to be partial adversaries and adverse witnesses rather than impartial assistants to a fact-finding body.

\* \* \* \* \* \*

In sum, the Dubai proceedings are not in substantial conformity with our notions of fundamental fairness and due process. Accordingly, if the Committee has not decided Refco's claim by April 16, 1991, this court will lift the stay of this action so that it may proceed in this court.

SO ORDERED.