12 F.3d 317
 62 USLW 2404
 The DREXEL BURNHAM LAMBERT GROUP INC., and Refco, Inc.,
Plaintiffs-Appellees,
v.
The COMMITTEE OF RECEIVERS FOR A.W. GALADARI, and The
Emirate of Dubai, United Arab Emirates,
Defendants-Appellants,
and
A.W. Galadari, and A.W. Galadari Commodities, a division of
A.W. Galadari Holdings (Private) Limited, Defendants.
 Nos. 1545, 1546, Dockets 93-7078, 93-7086.
 United States Court of Appeals,
Second Circuit.
 Argued April 29, 1993.
Decided Nov. 29, 1993.
 
 H. Barry Vasios, New York City (Anjali G. Asnanee, Elizabeth A. Berney, Gilbert, Segall and Young, of counsel), for defendant-appellant The Emirate of Dubai, United Arab Emirates.
 Richard W. Reinthaler, New York City (Paul L. Friedman, Dwight A. Healy, White & Case, of counsel), for defendant-appellant The Committee of Receivers for A.W. Galadari.
 Edward L. Powers, New York City (Joel L. Dempsey, Richards & O'Neil, New York City, Thomas W. Hill, Jr., West Palm Beach, FL, of counsel), for plaintiff-appellee The Drexel Burnham Lambert Group, Inc.
 Marianne Bretton-Granatoor, New York City (Jack Weinberg, Therese M. Doherty, Graubard Mollen Horowitz Pomeranz & Shapiro, of counsel), for plaintiff-appellee Refco, Inc.
 Before: LUMBARD, NEWMAN,* and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Defendants-appellants The Committee of Receivers for A.W. Galadari (the "Committee") and The Emirate of Dubai, United Arab Emirates (the "Emirate") appeal from an order entered January 19, 1993 in the United States District Court for the Southern District of New York, Constance Baker Motley, Judge, that denied their motions to dismiss the amended and supplemental complaints of plaintiffs-appellees The Drexel Burnham Lambert Group Inc. ("Drexel") and Refco, Inc. ("Refco") in this consolidated action, and directed that the Committee and the Emirate provide Drexel and Refco with security covering costs and, in the case of Refco, attorney fees. The Committee and the Emirate sought to dismiss the amended and supplemental complaints on the basis, inter alia, that they were entitled to sovereign immunity pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. Secs. 1330, 1602-1611 (the "FSIA"), and the court accordingly lacked subject matter jurisdiction. The Emirate also appeals from a January 22, 1993 order of the district court that denied the Emirate's motion to quash discovery against the Emirate.
 
 
 2
 We reverse the order denying the motion to dismiss the complaint on the basis that the Committee and the Emirate are entitled to foreign sovereign immunity. We also dismiss as moot the appeal from the order denying the Emirate's motion to quash discovery.
 
 Background
 
 3
 In this appeal, we revisit a litigation commenced more than nine years ago that has occasioned one prior opinion of this court, as well as a number of opinions by the district court. See Drexel Burnham Lambert Group Inc. v. Galadari, 777 F.2d 877 (2d Cir.1985) ("Drexell II "), aff'g in part and vacating in part 610 F.Supp. 114 (S.D.N.Y.1985) ("Drexel I "); Drexel Burnham Lambert Group, Inc. v. Galadari, No. 84 Civ. 2602 (CBM), 1986 WL 4692 (S.D.N.Y. Apr. 17, 1986) ("Drexel III"); Drexel Burnham Lambert Group, Inc. v. Galadari, No. 84 Civ. 2602, 1987 WL 6164, U.S.Dist.LEXIS 5030 (S.D.N.Y. Jan. 29, 1987) ("Drexel IV "); Refco, Inc. v. Galadari, 755 F.Supp. 79 (S.D.N.Y.1991); Drexel Burnham Lambert Group, Inc. v. Galadari, 134 B.R. 719 (S.D.N.Y.1991) ("Drexel V "); Drexel Burnham Lambert Group, Inc. v. Galadari, 127 B.R. 87 (S.D.N.Y.1991) ("Drexel VI "). Familiarity with these decisions, and with the decision of the district court from which the instant appeal is taken, Drexel Burnham Lambert Group, Inc. v. Committee of Receivers for A.W. Galadari, 810 F.Supp. 1375 (S.D.N.Y.1993) ("Drexel VII "), is assumed.
 
 
 4
 In April 1984, the Emirate established the Committee to wind up the business affairs and liquidate all nonbanking assets of Abdul Wahab Bin Ebrahim Galadari ("Galadari"), a citizen of Dubai, following a financial crisis in Dubai precipitated by the threatened collapse of the Union Bank of the Middle East, Ltd. ("Union"). Galadari controlled Union, one of the largest banks in the United Arab Emirates. The Committee is the successor to a provisional board of directors (the "Provisional Board") established by the government of Dubai in November 1983 to manage both Union and (until the formation of the Committee) Galadari's nonbanking assets. The Committee is comprised of four prominent citizens of Dubai, and is vested with the authority to liquidate Galadari's assets, pay Galadari's creditors, and bring and defend actions on behalf of the Galadari "estate." Decisions of the Committee may be appealed to a three-member judicial committee established for this purpose. We have noted that the decree which established the Committee "appears to be Dubai's first attempt to frame an insolvency law." Drexel II, 777 F.2d at 881.
 
 
 5
 Galadari had served as chairman of Union's board of directors, and had also controlled A.W. Galadari Holdings (Private) Ltd. ("Holdings"), a Dubai corporation that owned forty-six percent of Union's stock. Galadari's business ventures also included A.W. Galadari Commodities ("Commodities"), a partnership managed by Galadari that engaged in commodities trading on United States exchanges. Commodities conducted trading through, inter alia, accounts maintained with Drexel and Refco.
 
 
 6
 A. The Drexel Action.
 
 
 7
 The Drexel action stems from certain trading losses incurred by Galadari in 1982 and covered by a Drexel affiliate, Drexel Burnham Lambert International, N.V. ("Drexel International"). In satisfaction of the resulting debt, Galadari and Commodities provided a promissory note (the "Note") in the amount of $19,465,000 to Drexel International, secured by a pledge of 6,068,640 shares of Union stock. Drexel International assigned the Note to Drexel in October 1982.
 
 
 8
 Galadari and Commodities made some payments of principal on the Note that reduced the principal outstanding by $7,000,000, as well as some payments of interest, but defaulted and ceased payments in February 1984. Drexel made an initial demand for payment of the balance due on the Note to the Provisional Board, which the Board rejected. On April 12, 1984 Drexel instituted the present action against Galadari and Commodities seeking recovery on the Note. On April 17, 1984, the Committee was established by royal decree to wind up Galadari's affairs.
 
 
 9
 On May 17, 1984, the Committee filed an answer to Drexel's complaint "on behalf of Galadari and Commodities" that set forth numerous affirmative defenses, including (1) lack of subject matter jurisdiction, and (2) deference in favor of proceedings conducted by the Committee on the basis of (a) international comity, and (b) the act of state doctrine. The Committee did not then assert the defense of foreign sovereign immunity.
 
 
 10
 On May 24, 1984, Drexel moved for summary judgment. The Committee cross-moved to stay or dismiss the action on the grounds of (1) lack of subject matter jurisdiction, (2) international comity, and (3) the act of state doctrine. The district court denied Drexel's motion and the Committee's cross-motion insofar as it rested upon lack of subject matter jurisdiction and the act of state doctrine, but dismissed the complaint on the basis of international comity. See Drexel I, 610 F.Supp. at 117-19.
 
 
 11
 Drexel appealed from the dismissal on the basis of comity, and the Committee cross-appealed from the refusal to dismiss on grounds of subject matter jurisdiction and the act of state doctrine. We affirmed on the cross-appeal, but vacated the dismissal of the action and remanded for an evidentiary hearing on the question whether comity called for deference to the Committee's proceedings in Dubai. See Drexel II, 777 F.2d at 881-82. We noted that "our courts have had no experience with Dubai bankruptcy practices and procedures," id. at 881, and that Drexel had not had an opportunity to conduct discovery regarding these procedures. See id.
 
 
 12
 Drexel then moved in the district court to enjoin the Committee from proceeding with the adjudication of Drexel's claim in Dubai. In a memorandum of law filed in response to Drexel's motion, the Committee noted that "Drexel's application for injunctive relief represents the first time in this action that any claim for relief has been asserted against the Committee itself, as distinguished from the two named defendants," and added that "[i]f Drexel believes it has a basis for a claim against the Committee, it should be required to move for leave to amend its complaint or bring a new action, naming the Committee as a defendant ... and providing the Committee with a proper opportunity to ... assert its immunity from suit under the [FSIA]."
 
 
 13
 The district court denied Drexel's application for a preliminary injunction. See Drexel III, 1986 WL 4692 at * 1-2. In a subsequent opinion, the district court found that "[t]he Dubai bankruptcy decree and proceedings at issue here have been shown by [the Committee] to be consistent with our basic notions of fairness and due process" and to be "fundamentally fair to all creditors." Drexel IV, 1987 WL 6164, at * 18, 1987 U.S.Dist.LEXIS 5030, at * 49. The district court accordingly stayed this action pending resolution of Drexel's claims in Dubai. Id. 1987 WL 6164, at * 26, 1987 U.S.Dist. LEXIS 5030, at * 71.
 
 
 14
 B. The Refco Action.
 
 
 15
 As in the case of Drexel, the dispute concerning Refco originated in trading losses incurred by Galadari and Commodities and covered by Refco. It is undisputed that Galadari and Commodities owed Refco $6,109,664.20 pursuant to (1) a customer agreement between Refco and Galadari dated March 24, 1983, and (2) a letter agreement dated July 6, 1983 that was executed by Galadari on his and Commodities' behalf. The letter agreement acknowledged the $6,109,664.20 debt and specified terms of repayment. Refco received $1.5 million in payments on this debt, leaving an outstanding balance of $4,609,664.20.
 
 
 16
 In August 1984, Refco brought suit against Galadari and Commodities in the Supreme Court of the State of New York, County of New York, to collect this debt. In that action, Refco obtained a temporary restraining order to bar the sale or encumbrance of any and all assets held by Galadari and Commodities or by others for their account, and also sought to attach and levy upon such property. The Committee appeared in the New York court to oppose this application on the grounds of (1) fairness to other creditors in the Dubai liquidation proceedings, and (2) international comity. In an order dated March 27, 1985, the New York court (Kenneth Shorter, Justice ) declined to continue the restraining order except as it related to a condominium apartment in New York City maintained by Galadari's family and owned by a Bermuda corporation, all of whose outstanding shares were owned by Galadari and/or his wife, and denied the application for an attachment. The New York court also ruled sua sponte that "[t]he [Committee] shall be added as an additional party." Refco, Inc. v. Galadari, No. 18541/84, slip op. at 4 (N.Y.Sup.Ct., N.Y. County Mar. 27, 1985).
 
 
 17
 Subsequently, in a September 1985 memorandum of law "submitted by additional defendant, the Committee of Receivers" in support of a motion to dismiss or stay the state court action, the Committee asserted that under the FSIA, the state court did not have personal or subject matter jurisdiction over the Committee. By stipulation of the parties, this motion was thereafter withdrawn, and the action was stayed in the New York court upon representations by the Committee that it was actively engaged in reviewing Refco's claims in proceedings in Dubai. In January 1990, Refco refused to consent to further adjournments in favor of proceedings in Dubai, and the Committee removed the action to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. Sec. 1441(d) (1988). The case was assigned to Judge Motley, who in January 1991 (1) denied Refco's motion to remand the case to state court, (2) consolidated the removed action with the Drexel action, and (3) stayed the consolidated action pending the outcome of the proceedings in Dubai. See Refco, 755 F.Supp. at 84.
 
 
 18
 Finally, when the Committee ultimately served an answer to Refco's initial complaint in July 1991, it asserted foreign sovereign immunity among its affirmative defenses.
 
 
 19
 C. The Consolidated Action.
 
 
 20
 The key issue in the Dubai proceedings was whether, as Drexel and Refco contended, Commodities was a division of Holdings, with the result that the claims of Drexel and Refco against Commodities could be satisfied from the assets of Holdings. Holdings had significant liquid assets, but Commodities did not. In attempting to resolve this issue, the Committee held a series of hearings, reviewed documents and expert opinions submitted by the parties, and commissioned an independent review of the books and records of both Commodities and Holdings. With no decision forthcoming by early 1991, however, Drexel and Refco moved in the district court to vacate the stay, claiming that the Dubai proceedings should no longer be accorded comity because they had been conducted in an unfair manner and inordinately delayed in an attempt to deny their legitimate claims.
 
 
 21
 The district court rendered opinions dated March 19, 1991 (Drexel V ) and April 8, 1991 (Drexel VI ) in response to the applications by Drexel and Refco, respectively, to vacate the stay. The court agreed with the contentions of Drexel and Refco that the Committee had unfairly considered and unjustifiably delayed resolution of the "relatively simple" Holdings/Commodities question citing, inter alia, (1) numerous expert opinions regarding the issue to which the Committee had access but which had apparently failed to resolve the matter, (2) continued representations of the Committee to the district court that a decision on this question was imminent, and (3) a conflict of interest on the part of a counsel who both represented the Committee in the district court action in contesting the claims of Drexel and Refco and served as a legal advisor to the Committee in Dubai. See Drexel V, 134 B.R. at 722-28; Drexel VI, 127 B.R. at 93-100. The court also expressed the view that the Committee was orchestrating a determination adverse to Drexel and Refco in contravention of the evidence presented to it. See Drexel VI, 127 B.R. at 98-99. Accordingly, the district court ruled that unless the Committee rendered a decision on the outstanding claims by April 16, 1991, the stay would be vacated.
 
 
 22
 On April 14, 1991 the Committee rendered its decision (1) conceding the indebtedness of Galadari and Commodities to Drexel and Refco, but (2) rejecting the contention of Drexel and Refco that Commodities was a division of Holdings and that Holdings was accordingly liable for the debts of Commodities, and (3) ruling that Drexel's Note was not properly secured by Galadari's pledge of Union shares. Drexel and Refco appealed the Committee's decision in Dubai,[1] and also moved in district court to vacate the outstanding stay. In an order entered July 1, 1991, the district court granted the motion to vacate the stay, noting as "another example of fundamental unfairness and a denial of due process" the fact that the appeal of the Committee's decision would be heard in Arabic rather than English, although the proceedings before the Committee had been conducted in English.
 
 
 23
 The Committee then filed an amended and supplemental answer to Drexel's complaint, as before "in its representative capacity on behalf of defendants Galadari and Commodities." The Committee did not plead the defense of foreign sovereign immunity, but asserted affirmative defenses calling for deference to the Committee's prior determination on the basis of comity, New York law regarding the recognition of foreign judgments, and res judicata.
 
 
 24
 Thereafter, with leave of the district court and over the Committee's objections citing, inter alia, the FSIA, Drexel and Refco filed amended and supplemental complaints that asserted new claims for relief directly against the Committee and the Emirate. These new claims alleged that: (1) the Committee and the Emirate were responsible as successors-in-interest for the liabilities of Galadari, Commodities, and Holdings; (2) the Committee and the Emirate had breached promises and representations to Drexel and Refco that their claims would be fairly adjudicated in the Dubai proceedings; and (3) the Committee's wrongful refusal to pay these claims constituted an unlawful taking of property without just compensation in violation of international law.
 
 
 25
 The parties then entered into a stipulation dated March 18, 1992 by which the Committee's counsel agreed to accept service of the amended and supplemental complaints and related documents "on behalf of defendant The Committee of Receivers, qua Committee and as representative of [Galadari, Commodities and Holdings]." The stipulation, however, was
 
 
 26
 without prejudice to and [did] not constitute a waiver of:
 
 
 27
 (a) the merits of any jurisdictional or other defenses the Committee may have with respect to the claims set forth in the Amended and Supplemental complaints ...;
 
 
 28
 (b) any arguments or claims that Refco and/or Drexel may have that the Committee, through its prior participation in the proceedings in this Court and in the New York state court prior to removal of the Refco action, assumed the status of a "party" and/or waived the defense, if any, of sovereign immunity;
 
 
 29
 (c) the Committee's contrary position with respect to paragraph [b] hereof; and
 
 
 30
 (d) any argument or claims that any party may have with respect to whether the Committee is a political subdivision, agency or instrumentality, and/or alter ego of the [Emirate].
 
 
 31
 On June 8, 1992, the Committee answered Drexel's amended and supplemental complaint "in its representative capacity on behalf of defendants Galadari and Commodities only" without asserting the defense of foreign sovereign immunity, while again asserting affirmative defenses calling for deference to the Dubai proceedings. The Committee answered the Refco amended and supplemental complaint similarly, but added the affirmative defenses of forum non conveniens and absence of personal jurisdiction over the defendants.
 
 
 32
 On August 24, 1992, the Emirate moved to dismiss the amended and supplemental complaints on the basis of foreign sovereign immunity pursuant to the FSIA, lack of personal jurisdiction over the Emirate, the act of state doctrine, judicial immunity, and "the applicable statutes of limitation."[2] The Emirate also moved to quash discovery against the Emirate. The district court denied these motions, concluding that the Committee and the Emirate had implicitly waived foreign sovereign immunity "[b]ecause the Committee voluntarily intervened as the real party in interest in both federal and state proceedings and filed responsive pleading[s] without preserving its right to sovereign immunity," and because the Emirate "appeared through its agent the Committee without preserving immunity." Drexel VII, 810 F.Supp. at 1384-85; see 28 U.S.C. Sec. 1605(a)(1) (1988). The court ruled alternatively that the Committee and the Emirate were not entitled to FSIA immunity because the Committee and the Emirate had engaged in commercial activity in Dubai that directly affected Drexel and Refco in the United States. See Drexel VII, 810 F.Supp. at 1385-88; 28 U.S.C. Sec. 1605(a)(2) (1988).
 
 
 33
 The court also rejected proffered defenses of absence of personal jurisdiction, id. at 1388-90, the act of state doctrine, id. at 1390-91, judicial immunity, id. at 1391-92, and the statute of limitations. Id. at 1392. The district court granted a motion by Drexel and Refco that the Committee and the Emirate be required to provide Drexel and Refco with security covering costs and, in the case of Refco, attorney fees. Id. at 1392-93. Finally, in a January 22, 1993 bench ruling, the district court denied the Emirate's motion to quash discovery.
 
 
 34
 These appeals followed. In response to motions by the Committee and the Emirate, this court stayed all proceedings in the district court pending the determination of this appeal and expedited the appeal. In addition, we dismissed on jurisdictional grounds the Committee's appeal from the district court's decision to grant security for costs to Drexel and Refco.
 
 Discussion
 
 35
 The district court correctly concluded that insofar as the amended and supplemental complaints assert claims directly against the Emirate and the Committee as an instrumentality of the Emirate, the FSIA provides the sole basis for subject matter jurisdiction in United States courts. See Drexel VII, 810 F.Supp. at 1379-80 (citing Republic of Argentina v. Weltover, Inc., --- U.S. ----, 112 S.Ct. 2160, 2164, 119 L.Ed.2d 394 (1993); Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989)); see also Saudi Arabia v. Nelson, --- U.S. ----, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993); NYSA-ILA Pension Trust Fund v. Garuda Indonesia, 7 F.3d 35, 38 (2d Cir.1993) (citing Amerada Hess, 488 U.S. at 434, 109 S.Ct. at 688). When review of a denial of a motion to dismiss for lack of subject matter jurisdiction under the FSIA is sought, "[w]e have appellate jurisdiction pursuant to the 'collateral order doctrine' of Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 545-47, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949)." Weltover, Inc. v. Republic of Argentina, 941 F.2d 145, 147 (2d Cir.1991) (citing Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 443 (D.C.Cir.1990)), aff'd, --- U.S. ----, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992).
 
 
 36
 Because the issues presented for consideration on this appeal involve the application of the FSIA to essentially undisputed facts, we review de novo. See Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1016-17 (2d Cir.1991). As to the waiver issue, while we have recognized some discretion on the part of district courts to determine whether a waiver of FSIA immunity has occurred in a particular case, see Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A., 727 F.2d 274, 278 (2d Cir.1984), a review for abuse of discretion yields the same outcome in this case, because "[a]buse of discretion can be found if the district court incorrectly applied the law." Nikon Inc. v. Ikon Corp., 987 F.2d 91, 94 (2d Cir.1993) (citing Bristol-Myers Squibb Co. v. McNeill-P.P.C., Inc., 973 F.2d 1033, 1038 (2d Cir.1992)). In our view, the district court incorrectly applied the law regarding both the "waiver" and "commercial activity" exceptions to the general rule of foreign sovereign immunity provided by the FSIA.
 
 
 37
 A. The Applicable Provisions of the FSIA.
 
 
 38
 The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. Sec. 1604 (1988). The Emirate is a foreign state, and the parties do not dispute that the Committee is an "agency or instrumentality" of the Emirate as defined in 28 U.S.C. Sec. 1603(a) and (b) (1988), and thus subject to the FSIA. The exceptions at issue in this case are provided by Sec. 1605(a)(1) and (2), which provides that:
 
 
 39
 A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--
 
 
 40
 (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver; [or]
 
 
 41
 (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States....
 
 
 42
 "Under the [FSIA], a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject matter jurisdiction over a claim against a foreign state." Nelson, --- U.S. at ----, 113 S.Ct. at 1476 (citing Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 488-89, 103 S.Ct. 1962, 1968-69, 76 L.Ed.2d 81 (1983)); see also Weltover, --- U.S. at ----, 112 S.Ct. at 2164; Amerada Hess, 488 U.S. at 434-35, 109 S.Ct. at 688-89. Furthermore,
 
 
 43
 [o]nce the defendant presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with showing that, under exceptions to the FSIA, immunity should not be granted, Baglab Ltd. v. Johnson Matthey Bankers Ltd., 665 F.Supp. 289, 293-94 (S.D.N.Y.1987), although the ultimate burden of persuasion remains with the alleged foreign sovereign. Forsythe v. Saudi Arabian Airlines Corp., 885 F.2d 285, 289 n. 6 (5th Cir.1989).
 
 
 44
 Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1016 (2d Cir.1993); see also Drexel VII, 810 F.Supp. at 1380-81 (discussing burden shifting in FSIA cases).
 
 
 45
 We now consider, against this background, the specific exceptions to FSIA immunity at issue in this case.
 
 
 46
 B. The Waiver Exception.
 
 
 47
 The district court looked to our ruling in Shapiro, and the legislative history cited in that case, to provide the standard by which to determine this issue. We said in Shapiro:
 
 
 48
 Federal courts have been virtually unanimous in holding that the implied waiver provision of Section 1605(a)(1) must be construed narrowly. See, e.g., Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 444 (D.C.Cir.1990); Joseph v. Office of the Consulate General, 830 F.2d 1018, 1022 (9th Cir.1987), cert. denied, 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988); Frolova v. USSR, 761 F.2d 370, 377 (7th Cir.1985); L'Europeenne de Banque v. La Republica de Venezuela, 700 F.Supp. 114, 123 (S.D.N.Y.1988). This approach is derived from the legislative history of the FSIA, in which Congress specified three examples of implied waiver. The House Report thus states:
 
 
 49
 With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract. An implicit waiver would also include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity.
 
 
 50
 H.R.Rep. No. 1487, 94th Cong., 2d Sess. 18, reprinted in 1976 U.S.Code Cong. & Admin.News 6604, 6617. These examples involve circumstances in which the waiver was unmistakable, and courts have been reluctant to find an implied waiver where the circumstances were not similarly unambiguous.
 
 
 51
 930 F.2d at 1017 (emphasis added).
 
 
 52
 The district court concluded that the Committee had met the Shapiro standard for waiving FSIA immunity by filing responsive pleadings in this litigation without preserving its immunity. Drexel VII, 810 F.Supp. at 1383-84. The court quoted, id. at 1383, our statement in Drexel II that: "In response to Drexel's suit upon the promissory note, the Committee appeared generally and asserted twenty-five affirmative defenses." 777 F.2d at 880. The court stressed that FSIA immunity was not among them. Drexel VII, 810 F.Supp. at 1383. Similarly, the court emphasized that "in the Refco action, the Committee appeared in 1984 and opposed Refco's motion for an order of attachment without raising the issue of sovereign immunity." Id. Rather, the Committee "argued that Refco's motion should be denied or stayed upon comity principles." Id.
 
 
 53
 The district court rejected the Committee's contention that it appeared only in a representative capacity in behalf of Galadari and Commodities at these early junctures in the Drexel and Refco actions. Rather, the court opined that the Committee and the Emirate were the "real parties in interest" in the litigation as a result of the Emirate's taking control of Union, some of whose shares were used to secure the Note provided by Galadari and Commodities to Drexel, and the Committee's marshalling and liquidation of Galadari's nonbanking assets. Id. at 1384. The court concluded:
 
 
 54
 Because the Committee voluntarily intervened as the real party in interest in both federal and state proceedings and filed responsive pleading[s] without preserving its right to sovereign immunity, the Committee has failed to meet its burden of proving that it did not implicitly waive its right to immunity. Additionally, because [the Emirate] is the real party in interest as to Galadari's banking assets and appeared through its agent the Committee without preserving immunity, [the Emirate] has failed to meet its burden of proving that it did not implicitly waive immunity. This court, therefore, has subject matter jurisdiction under the waiver exception of the FSIA as to both the Committee and [the Emirate].
 
 
 55
 Id. at 1384-85.
 
 
 56
 This conclusion is at least implicitly premised upon a passage of legislative history quoted in Shapiro: "An implicit waiver would also include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity." Shapiro, 930 F.2d at 1017 (quoting H.R.Rep. No. 1487 at 18). Shapiro further counsels that in evaluating this conclusion, we must bear in mind that "the implied waiver provision of Section 1605(a)(1) must be construed narrowly," id. (collecting cases), and that any waiver must accordingly be "unmistakable" and "unambiguous." Id.
 
 
 57
 The Committee and the Emirate were first named as parties defendant in the amended and supplemental complaints filed by Drexel and Refco in the consolidated action. The answers to those complaints, made by the Committee "in its representative capacity in behalf of defendants Galadari and Commodities only," did not assert the defense of FSIA immunity. They were followed almost immediately, however, by a motion to dismiss that did assert the defense. In addition, the Committee had previously: (1) responded to a motion by Drexel to enjoin the Committee's Dubai proceedings by soliciting the district court to require Drexel to amend its complaint to name the Committee as a party as a condition of seeking relief directly against the Committee, pointing out that the Committee would thus be provided the opportunity to assert FSIA immunity; (2) moved to dismiss the Refco action in New York Supreme Court on the basis of FSIA immunity promptly after that court added the Committee as party to that action sua sponte; (3) asserted FSIA immunity as a defense in the initial answer that the Committee filed in the Refco action after it was removed to federal court; (4) cited the FSIA in its opposition to the motions of Drexel and Refco for leave to file amended and supplemental complaints in the consolidated action naming the Committee and the Emirate as defendants; and (5) preserved the defense of FSIA immunity in the stipulation by which the Committee agreed to accept service of the amended and supplemental complaints.
 
 
 58
 We cannot read such a record as providing the "unmistakable" and "unambiguous" waiver of FSIA immunity that is required by Shapiro. The common sense interpretation of the legislative history cited by Shapiro is that the filing of a responsive pleading is the last chance to assert FSIA immunity if the defense has not been previously asserted. When, as in this case, the filing of answers to the amended and supplemental complaints in the consolidated action was preceded by five invocations of FSIA immunity, including the Committee's initial answer to a Refco complaint, and almost immediately followed by a motion to dismiss on the ground, inter alia, of FSIA immunity, we perceive no basis to find that a Sec. 1605(a)(1) waiver has occurred.
 
 
 59
 This analysis is also supported by our ruling in Canadian Overseas. In that case, no responsive pleading was ever filed, but the defendant claiming FSIA immunity ultimately moved to dismiss on that basis, after moving to dismiss or stay on other grounds more than two years earlier without asserting FSIA immunity. However, the defendant had previously "implicitly or explicitly reserved its right to assert [FSIA] immunity in three separate documents--its petition for removal, its memorandum in opposition to remand and [a] stipulation concerning the amended complaint." 727 F.2d at 276. We affirmed the dismissal that was granted in response to the second motion to dismiss, while noting "the discretionary authority of district courts to effect an earlier resolution of the [FSIA immunity] issue by requiring, on the motion of a party or sua sponte, assertion or abandonment of the defense prior to the submission of a responsive pleading." Id. at 278. We also concluded that although "district courts have discretion to determine that the conduct of a party in litigation does constitute a waiver of [FSIA] immunity in light of the circumstances of a particular case" regarding the party's conduct in the litigation, id., the district court had not exceeded its discretion by refusing to find a waiver in view of (1) the defendant's assertion on three occasions of an intention to assert the defense, and (2) the fact that the litigation had been dormant for a considerable period of time.
 
 
 60
 The Committee's essential effort in this litigation has been to persuade the district court to defer to the proceedings before the Committee in Dubai. In Foremost-McKesson, a similar case, the Court of Appeals for the District of Columbia determined that the Republic of Iran should be allowed to assert the defense of FSIA immunity in an amended answer, even though its initial answer did not do so, because of the limited nature of the initial pleading. In that case, the plaintiffs sued the Republic of Iran, contending that Iran had illegally divested the plaintiffs of their ownership rights in a dairy. See 905 F.2d at 440-41. Iran filed an "Answer to Complaint" in response to plaintiffs' complaint that neither denied the allegations of the complaint nor asserted FSIA immunity. See id. at 441, 444. Instead, Iran maintained that any claims that the plaintiffs had were required to be brought before a claims tribunal established for that purpose. See id. Following the decision of that body, plaintiffs sought to renew their lawsuit, and the district court granted Iran's resulting motion to amend its answer to assert the defense of FSIA immunity despite Iran's previous silence on this issue. Id. at 442.
 
 
 61
 On appeal, the court rejected the plaintiffs' claim that Iran had impliedly waived FSIA immunity and should not have been allowed to amend its answer to assert that defense. The court stated:
 
 
 62
 Foremost is correct in asserting that, in most instances, a state's failure to assert sovereign immunity in a responsive pleading will constitute a waiver of the defense. But the situation here is different because, in 1982, Iran did not respond substantively to any of the averments in the complaint or pose any defenses to the claims; instead, Iran merely argued that the action should proceed in another forum, which it then did. Iran's actions in these circumstances did not constitute an implied waiver.
 
 
 63
 It is true that the House Report accompanying FSIA provides that "[a]n implicit waiver would ... include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity." H.Rep. No. 1487, 94th Cong., 2d Sess. 18 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6604, 661. We agree with the Seventh Circuit, however, that the example of an implied waiver
 
 
 64
 given in the legislative history--filing a responsive pleading without raising an immunity defense--demonstrates that Congress anticipated, at a minimum, that waiver would not be found absent a conscious decision to take part in the litigation and a failure to raise sovereign immunity despite the opportunity to do so.
 
 
 65
 Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370, 378 (7th Cir.1985) (citation omitted). Iran's 1982 Answer does not exhibit such a conscious decision or opportunity.
 
 
 66
 Id. at 443-44 (emphasis added). Although the analogy to Foremost-McKesson is not perfect, that case affords strong support to our conclusion that on the overall record in this case, no implicit waiver of FSIA immunity may properly be attributed to the Committee and the Emirate.
 
 
 67
 We also conclude that the district court's ruling that the Committee was the "real party in interest" with respect to the nonbanking assets of Galadari and Commodities, and that the Emirate should be so regarded with respect to the Union shares that Galadari pledged to Drexel, see Drexel VII, 810 F.Supp. at 1384, cannot form an alternate basis for a finding of implied waiver of FSIA immunity. The thrust of this ruling is to deprecate the Committee's claims that it appeared in a representative capacity in behalf of Galadari and Commodities until the Committee and the Emirate were explicitly named as defendants in the amended and supplemental complaints in the consolidated action. The view taken regarding the "real party in interest" question, however, does not materially affect the nature of the Committee's involvement in the earlier stages of the litigation. Assuming arguendo that the Committee, despite its intention to appear in a representative capacity, should be deemed to have appeared generally because it was the "real party in interest," the question remains whether, given its understanding of its position, the Committee adequately signalled the present or future invocation of FSIA immunity. However its participation is regarded, the Committee consistently invoked FSIA immunity, or reserved the right to do so in the future, to an extent that precludes a determination that FSIA immunity was unambiguously and unmistakably waived.
 
 
 68
 C. The Commercial Activity Exception.
 
 
 69
 The district court determined that the Committee and the Emirate were not entitled to FSIA immunity not only because they had implicitly waived that immunity within the meaning of Sec. 1605(a)(1), but also because they had engaged in activity that fell within the "commercial activity" exception contained in the third clause of Sec. 1605(a)(2). This exception provides for subject matter jurisdiction in cases "in which the action is based upon ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. Sec. 1603(d) defines "commercial activity" to mean
 
 
 70
 either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.
 
 
 71
 The Supreme Court has specified that "a state engages in commercial activity [within the meaning of Sec. 1605(a)(2) ] where it exercises ' "only those powers that can also be exercised by private citizens," ' as distinct from those ' "powers peculiar to sovereigns." ' " Nelson, --- U.S. at ----, 113 S.Ct. at 1479 (quoting Weltover, --- U.S. at ----, 112 S.Ct. at 2166 (quoting Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 704, 96 S.Ct. 1854, 1866, 48 L.Ed.2d 301 (1976) (plurality opinion))). In Nelson, the Court addressed the claim of a United States citizen who alleged that he had been recruited in the United States by an agency of Saudi Arabia for employment in that nation, and was subsequently imprisoned and tortured there for complaining about workplace safety hazards. --- U.S. at ---- - ----, 113 S.Ct. at 1474-75. The Court held that the victim's intentional tort claims, see id. --- U.S. at ---- - ----, 113 S.Ct. at 1475-76, and claims for "negligent failure to warn" of this danger, see id. --- U.S. at ----, 113 S.Ct. at 1476, as well as derivative claims brought by his spouse, see id., were not premised upon "commercial activity" by Saudi Arabia within the meaning of Sec. 1605(a)(2). See id. --- U.S. ---- - ----, 113 S.Ct. at 1478-1481. The Court stated:
 
 
 72
 We emphasized in Weltover that whether a state acts "in the manner of" a private party is a question of behavior, not motivation:
 
 
 73
 "[B]ecause the Act provides that the commercial character of an act is to be determined by reference to its 'nature' rather than its 'purpose,' the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.' " Weltover, supra, at ----, 112 S.Ct., at 2166 (citations omitted) (emphasis in original).
 
 
 74
 We did not ignore the difficulty of distinguishing " 'purpose' (i.e., the reason why the foreign state engages in the activity) from 'nature' (i.e., the outward form of the conduct that the foreign state performs or agrees to perform)," but recognized that the [FSIA] "unmistakably commands" us to observe the distinction. 504 U.S., at ----, 112 S.Ct., at 2167 (emphasis in original).
 
 
 75
 Nelson, --- U.S. at ----, 113 S.Ct. at 1479. Because the exercise of police power had historically been understood to be a "peculiarly sovereign" function, the Court concluded that the plaintiffs had failed to state a claim based upon Sec. 1605(a)(2) "commercial activity." Id.
 
 
 76
 Weltover was an action brought by bondholders for breach of contract in response to a unilateral rescheduling of the bond payments by the Republic of Argentina. --- U.S. at ----, 112 S.Ct. at 2163-64. The unanimous Court ruled that Argentina's rescheduling of this debt was undertaken "in connection with a commercial activity" of Argentina, and had a "direct effect [upon bondholders] in the United States," within the meaning of the third clause of Sec. 1605(a)(2). Weltover, --- U.S. at ----, 112 S.Ct. at 2165-69. The Court noted that the bonds were "garden-variety debt instruments" (1) held by private parties, (2) freely negotiable (except in Argentina), and (3) the source of a stream of cash income over time. Id. at ----, 112 S.Ct. at 2166. Argentina contended that the bonds had been issued "to address a domestic credit crisis, and as a component of a program designed to control that nation's critical shortage of foreign exchange." Id. at ----, 112 S.Ct. at 2167. The Court responded that under the definition of "commercial activity" provided by Sec. 1603(d), which directs attention to the "nature," rather than the "purpose," of the activity under examination, "it is irrelevant why Argentina participated in the bond market in the manner of a private actor; it matters only that it did so." Id.
 
 
 77
 In the present case, the district court concluded that the third clause of Sec. 1605(a)(2) applied because "[w]hen [the Emirate] took over and provided for the management of [Union]," Drexel VII, 810 F.Supp. at 1387, and "[w]hen the Committee marshalled, managed, and liquidated Galadari's assets," id., they engaged in commercial activities outside the United States that could be conducted by a private party, and in fact had been performed by Galadari. See id.
 
 
 78
 We agree that these activities might be regarded as commercial,[3] but they are not activities that "cause[d] a direct effect in the United States," Sec. 1605(a)(2), upon which the claims of Drexel and Refco are based. Drexel and Refco do not claim that Union was mismanaged and that this had some detrimental "effect" upon them in the United States. Nor do they contend that the management of Galadari's assets by the Committee generated such an effect. Rather, their claims, explicitly set forth in their amended and supplemental complaints, are that (1) the Committee and the Emirate were responsible as successors-in-interest for the liabilities of Galadari and Commodities, (2) the Committee and the Emirate had breached promises and representations to Drexel and Refco that their claims would be fairly adjudicated in the Dubai proceedings, and (3) the Committee's wrongful refusal to pay these claims constituted an illegal taking of property without just compensation in violation of international law. The gravamen of these claims concerns the essentially judicial role of the Committee in marshalling the assets of Galadari and Commodities and adjudicating the claims of their creditors, including Drexel and Refco, and not any of the tangentially related commercial conduct in which the Committee or the Emirate might have engaged. But see supra note 3.
 
 
 79
 Drexel and Refco contend, on the contrary, that the third clause of Sec. 1605(a)(2) requires only that the foreign act that causes a direct effect in the United States occur "in connection with" a commercial activity, and (in effect) that the Committee's adverse adjudicative act was adequately connected to its assertedly commercial activities to satisfy the statute. They cite in this regard Nelson's observation that "Congress manifestly understood there to be a difference between a suit 'based upon' commercial activity [i.e., a suit brought under the first clause of Sec. 1605(a)(2) ] and one 'based upon' acts performed 'in connection with' such activity [i.e., one brought under the second and third clauses of Sec. 1605(a)(2) ]." Nelson, --- U.S. at ----, 113 S.Ct. at 1478. They also invoke in support of their argument L'Europeenne de Banque v. La Republica de Venezuela, 700 F.Supp. 114, 119-20 (S.D.N.Y.1988), and Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 709 n. 10 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993). We are unpersuaded.
 
 
 80
 The "acts" upon which the claims of Drexel and Refco are "based" are essentially the adverse determination of their claims by the Committee, including the determination that Galadari had not effectively pledged Union shares to Drexel as security for payment of the Note. As the Court stated in Nelson, the phrase "based upon" is "read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." --- U.S. at ----, 113 S.Ct. at 1477 (collecting cases). If the "connection" language of Sec. 1605(a)(2) were read, as Drexel and Refco seek, to include tangential commercial activities to which the "acts" forming the basis of the claim have only an attenuated connection, the "commercial activity" exception would effectively be rewritten to authorize the exercise of jurisdiction over acts that are essentially sovereign in nature. See Foremost-McKesson, 905 F.2d at 450 (exception provided by third clause of Sec. 1605(a)(2) inapplicable when "alleged commercial acts were subsumed within a sovereign activity"). We do not read the Supreme Court's rulings in Nelson and Weltover to support such a construction of Sec. 1605(a)(2).
 
 
 81
 The cases cited by Drexel and Refco do not call for a different conclusion. L'Europeenne addressed only the "direct effect in the United States" language of the third clause of Sec. 1605(a)(2), 700 F.Supp. at 121-22, and did not involve any adjudicative activity by the foreign entity that claimed FSIA immunity. Siderman noted that the "intervention and operation" of a foreign bank by a foreign entity could constitute Sec. 1605(a)(2) "commercial activity." 965 F.2d at 709 n. 10; but see Baglab Ltd. v. Johnson Matthey Bankers Ltd., 665 F.Supp. 289, 294 (S.D.N.Y.1987) ("The nationalization of a bank is a quintessentially sovereign activity and may not serve as the basis for a suit against the Bank.") (citing Alberti v. Empresa Nicaraguense, 705 F.2d 250 (7th Cir.1983); Carey v. National Oil Corp., 453 F.Supp. 1097 (S.D.N.Y.1978), aff'd, 592 F.2d 673 (2d Cir.1979) (per curiam)). The case involved "causes of action arising out of the torture of Jose Siderman and the expropriation of the Sidermans' property by Argentine military officials." 965 F.2d at 702.
 
 
 82
 The decree that established the Committee specified that it was to be the exclusive arbiter of disputes concerning claims to Galadari's assets, including claims regarding purported security interests held in Union by Galadari's creditors. Neither the resolution of creditors' claims against the Galadari estate nor the determination of which Union creditors held valid security interests in that bank constituted activity that could have been performed by private parties.[4] Accordingly, Sec. 1605(a)(2) does not strip the Committee and the Emirate of FSIA immunity in this action.
 
 Conclusion
 
 83
 In view of the foregoing, we need not address the other issues considered by the district court. The order denying the motion to dismiss the amended and supplemental complaints as against the Committee and the Emirate, and each and every claim asserted therein against the Committee and the Emirate is reversed; the district court is directed to dismiss the amended and supplemental complaints. The appeal from the order denying the Emirate's motion to quash discovery is dismissed as moot.
 
 JON O. NEWMAN, Chief Judge, dissenting:
 
 84
 The Court has ordered the dismissal, at the pleading stage, of a lawsuit that presents novel and subtle issues concerning complicated financial maneuverings in the Emirate of Dubai, United Arab Emirates ("Dubai"). Dismissal is ordered because the Court has concluded that the complaint does not allege conduct by the defendants falling within the "commercial activity" exception of the Foreign Sovereign Immunities Act, 28 U.S.C. Sec. 1605(a)(2) (1988). Instead, the Court holds, the conduct alleged to have been engaged in by Dubai and by a governmentally established committee is sufficiently within a judicial role to be excluded from the "commercial activity" exception. Because I am persuaded that a definitive decision as to the nature of the challenged conduct cannot fairly be made from the face of the complaint, I would uphold the District Court's order denying the motion to dismiss the complaint and let the matter proceed, at least to the summary judgment stage, if not to trial. I therefore respectfully dissent.
 
 
 85
 The lawsuit concerns the efforts of creditors, The Drexel Burnham Lambert Group Inc. ("Drexel") and Refco, Inc., to enforce rights originally arising from loan transactions with Abdul Galadari, a citizen of Dubai, and A.W. Galadari Commodities ("Commodities"), a division of A.W. Galadari Holdings (Private) Ltd. As a result of extreme financial difficulties experienced by Galadari and companies owned or controlled by him, the government of Dubai issued a series of decrees that appear to blend two types of activities that would be regarded as distinct, had they been undertaken in the course of insolvency proceedings in this country. On the one hand, the decrees created an adjudicative body, The Committee of Receivers for A.W. Galadari, et al. ("the Committee"), to act in a capacity similar to that of a United States bankruptcy court or a state court administering insolvency or receivership proceedings. On the other hand, the decrees also invested the Committee with authority to take over and operate Galadari's ventures, and the government of Dubai provided the Committee with substantial funds to be used for the creditors of the failed ventures. In this latter capacity, the Committee appears to have been functioning less like an adjudicator and more like either a successful purchaser of assets at a liquidation proceeding or a new corporation emerging from a Chapter 11 reorganization.
 
 
 86
 Though the capacity in which the Committee acted is in sharp dispute, the effect of at least some of its actions is quite clear, notably the Committee's decision to devote much of the fresh funds from the government of Dubai to satisfy the claims of residents of Dubai and to decline to pay the notes of Drexel and Refco. Plaintiffs allege that the chairman of the Committee refused payment of Drexel's note on the ground that the note represented "gambling losses." See Drexel, Burnham Lambert Group Inc. v. Committee of Receivers for A.W. Galadari, 810 F.Supp. 1375, 1386-87 n. 19 (S.D.N.Y.1993) ("Drexel ").
 
 
 87
 The District Court, in its careful and comprehensive opinion upholding the sufficiency of the complaint, demonstrated a sensitive awareness of the dual nature of the Committee's activity. Judge Motley wrote:
 
 
 88
 While the Committee has served in a quasi-judicial capacity, the Committee has also acted in commercial and non-judicial capacities. This court's jurisdiction in this matter is based upon the latter.
 
 
 89
 Drexel, 810 F.Supp. at 1391. In rejecting the District Court's ruling, this Court too recognizes that there are involved in this case some activities that are essentially judicial and some that "might be regarded as commercial." 11 F.3d at 329.
 
 
 90
 My disagreement with the Court arises because I lack the Court's ability to determine, from the face of the complaint alone, how to categorize the activities of a body created by the sovereign decree of a foreign state with whose laws and practices I have no familiarity. At an earlier stage of this litigation, we observed that "[b]ecause the Dubai decree appears to be Dubai's first attempt to frame an insolvency law, our courts have had no experience with Dubai bankruptcy practices and procedures." Drexel Burnham Lambert Group Inc. v. Galadari, 777 F.2d 877, 881 (2d Cir.1985). That deficiency has not been remedied.
 
 
 91
 The Court is able to place all of the activities underlying the plaintiffs' claim on the judicial side of the line between judicial and commercial activities only by making what I regard as a somewhat imprecise generalization. The Court says:
 
 
 92
 The gravamen of these claims concerns the essentially judicial role of the Committee in marshalling the assets of Galadari and Commodities and adjudicating the claims of their creditors, including Drexel and Refco, and not any of the tangentially related commercial conduct in which the Committee or the Emirate might have engaged.
 
 
 93
 11 F.3d at 329 (emphasis added).
 
 
 94
 Upon a development of the facts, assessed against an informed understanding of the law of Dubai in the field of creditors' rights and insolvency proceedings, it would be possible to know not simply what is the "gravamen" of the plaintiffs' claims, or what those claims "concern," or whether the Committee's role was "essentially" judicial. Instead, we would be in a position to know precisely what occurred, what the claims really are, and whether the particular actions of the Committee that caused injury to the plaintiffs really were judicial. Perhaps the Committee "adjudicated" the claims of Drexel and Refco and denied them, acting like a United States bankruptcy judge. But it is also possible that the Committee, acting like a successor corporation, used fresh cash from its "parent" entity to prefer some of its creditors and simply reneged on an enforceable obligation to discharge liabilities to the plaintiffs. I do not know which occurred, but I would give the plaintiffs an opportunity to develop evidence to show that their interpretation of the events is correct.
 
 
 95
 It is premature and unfair to dismiss this complaint at this time.
 
 
 
 *
 Judge Newman became Chief Judge of the Second Circuit Court of Appeals on July 1, 1993
 
 
 [1]
 The parties have not indicated the disposition of this appeal
 
 
 [2]
 As nearly as we can ascertain, the notice of motion and supporting papers were filed only on behalf of the Emirate, but the Committee subsequently filed a reply affidavit and reply declaration in support of the motion to dismiss. The district court stated that the Emirate and the Committee "separately move[d] to dismiss the amended and supplemental complaints." Drexel VII, 810 F.Supp. at 1377. We proceed on the basis that both the Emirate and the Committee moved to dismiss on the indicated grounds
 
 
 [3]
 Even the depiction of these activities as "commercial" is, however, suspect. Cf. In re Beck Indus. (Rothberg v. Kirschenbaum), 725 F.2d 880, 887 (2d Cir.1984) (" 'Merely to attempt to collect and liquidate the assets of a debtor is not to carry on its business in any proper sense of the term.' ") (quoting Austrian v. Williams, 216 F.2d 278, 285 (2d Cir.1954), cert. denied, 348 U.S. 953, 75 S.Ct. 441, 99 L.Ed. 745 (1955)); accord, In re Fidelity Mortgage Investors, Inc. (Fidelity Mortgage Investors v. Camelia Builders, Inc.), 550 F.2d 47, 57 (2d Cir.1976) (quoting Austrian, 216 F.2d at 285), cert. denied, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977)
 
 
 [4]
 Our dissenting colleague confesses an inability to discern, under the unfamiliar laws and practices of Dubai, "whether the particular actions of the Committee that caused injury to the plaintiffs really were judicial," invoking our observation eight years ago that "our courts have had no experience with Dubai bankruptcy practices and procedures." Drexel II, 777 F.2d at 881. In the interim, however, the Emirate has conducted lengthy proceedings that resulted in determinations adverse to Drexel and Refco. We do not consider ourselves at liberty to transmute these proceedings into a Sec. 1605(a)(2) "commercial activity," whether or not we might be wholly satisfied as to their fairness after further discovery or a full trial